IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

PHILADELPHIA INDEMNITY                §
INSURANCE COMPANY,                    §
                                      §
        Plaintiff,                    §
                                      §
COMAL TRACE HOMEOWNERS                §    CIVIL ACTION NO. 1:16-cv-1019-SS
ASSOCIATION, CHRIS ELDRIDGE,          §
BRYAN D. "DOUG" LIPPERT, JANE         §
LIPPERT, JOSEPH CAMPBELL,             §
ANITA CAMPBELL, RONALD                §
McKINNON, and COMAL TRACE             §
HOMEOWNERS ADVOCACY GROUP,            §
                                      §
        Defendants.                   §

## DEFENDANT, COMAL TRACE HOMEOWNERS ASSOCIATION'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Comes now Comal Trace Homeowners Association, Defendant herein, and files this, its Motion to Dismiss for Lack of Subject Matter Jurisdiction, pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure, and would show as follows:

I.

## UNDERLYING FACTS AND PROCEDURAL BACKGROUND

1.      Comal Trace Homeowners Association (hereinafter "the Association") is a homeowners association governing the Comal Trace subdivision in Comal County, Texas. It was sued by several of its members in a case entitled *Bryan D. "Doug" Lippert, et al. v. Comal Trace Homeowners Association*, Cause No. C2014-1453C, 274th Judicial District Court of Comal County, Texas) (hereinafter "the Underlying Lawsuit"). Attached hereto as Exhibit A and incorporated herein by reference for all purposes is a copy of the Plaintiffs' Fifth Amended

Petition in the Underlying Lawsuit, which is the live pleading filed by the Plaintiffs in that case. Attached as Exhibit B and incorporated herein by reference is a true and correct copy of the Amended Final Judgment in the Underlying Lawsuit.

2      The judgment in the Underlying Lawsuit has not become final. The trial court denied the Association's Motion for New Trial in the Underlying Lawsuit on November 2, 2016. The Association may still appeal the Judgment.

3.     This lawsuit was brought by the Association's insurance company, Philadelphia Indemnity Insurance Company (hereinafter "Philadelphia"), seeking a declaratory judgment relieving Philadelphia of liability to satisfy the judgment in the Underlying Lawsuit.

4.     Philadelphia has been providing a defense to the Association through the payment of legal fees to attorneys hired by Philadelphia to represent the Association in the Underlying Lawsuit. As of the date of the filing of this Motion, Philadelphia continues to defend the Underlying Lawsuit.

5.     Attached as Exhibit C is the Declaration of Tom L. Newton, Jr., as to the facts in Paragraphs 1, 2, and 4 above

## LACK OF SUBJECT MATTER JURISDICTION

6.     Inasmuch as this is the declaratory judgment action in which is the subject matter jurisdiction is based solely on diversity of citizenship, state law determines whether there exists a "case or controversy" to provide a basis for the court to grant relief under the federal declaratory judgment that. *Klein v. O'Neal, Inc.*, 2009 U.S. Dist. Lexis 101544 (N.D. Text 2009).

7.     Texas law provides that a dispute about a duty to indemnify an insured under a liability policy is ripe for adjudication once the liability litigation is resolved against the insured. *Farmers*

*County Mutual Ins. Company v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997). "It may sometimes be necessary to defer resolution of the indemnity issues until the liability litigation is resolved." *Id.*

8.      Although the duty to indemnify may be ripe before determination with the same facts that would negate a duty to defend also negate the duty to indemnify, that is not the case here.  Duty to defend is separate from its duty to indemnify. *Trinity Universal Ins.  Co. v. Cowan*, 945 S.W.2d 819, 821–22 (text 1997).

9.      It is the allegations of the plaintiff against the insured that control whether the insurance company has a duty to defend. *National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d, 139 (Tex. 1997). See also *Fidelity & Guaranty Ins.  Underwriters, Inc. v. McManus*, 633 S.W.2d 787, 788 (Tex. 1982).

10.      The plaintiffs in the underlying lawsuit assert allegations which triggered Philadelphia's duty to defend. All Plaintiffs allege in Plaintiffs' Fifth Amended Petition that their property rights were interfered with by the Association.  Plaintiff McKinnon alleges physical injury in Paragraph 130 of Plaintiffs' Fifth Amended Petition.  All Plaintiffs seek compensatory damages for those alleged damages.  In short, the Plaintiffs in the Underlying Lawsuit allege property damage and bodily injury, which Philadelphia concedes in the Complaint in this case <u>are</u> covered by the policy in question.

11.      Philadelphia is estopped from denying that it has a duty to defend, having assumed that defense.  In addition, Philadelphia bases its request for a determination against a duty to indemnify upon the <u>judgment</u>, rather than the allegations in the complaint in the Underlying Lawsuit, or its related duty to defend.

12.      Because the Underlying Lawsuit has not been resolved, it would be premature, as recognized by *Griffin*, for a duty to indemnify determination to be made. There is no case or

controversy because this matter is not ripe for adjudication.  Until such time as the liability litigation is resolved in the Underlying Lawsuit, the judgment may be changed, and the evidence supporting or the tending to diminish the rights of the parties may be added to or altered. Therefore this Court lacks subject matter jurisdiction under the Federal Declaratory Judgment Act, there is no pending case or controversy, and this is a case should be dismissed.

Respectfully submitted,

ALLEN, STEIN, & DURBIN, P.C.
6243 I.H. 10 West, Suite 700
San Antonio, Texas  78201
Telephone      (210) 734-7488
Telecopier     (210) 738-8036
tnewton@asdh.com

TOM L. NEWTON, JR.
State Bar No. 14982300

ATTORNEY FOR DEFENDANT,
COMAL TRACE HOMEOWNERS
ASSOCIATION

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing *Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction* was this 8th day of November, 2016, forwarded via email to:

R. Brent Cooper          Brent.cooper@cooperscully.com
Robert J. Witmeyer       Rob.witmeyer@cooperscully.com
Tarron L. Gartner-Ilai   Tarron.Gartner@cooperscully.com
Cooper & Scully, P.C.
900 Jackson Street, Suite 100
Dallas, TX 75202

TOM L. NEWTON, JR.

5537007/1460096

4

RECEIVED

AUG 3 1 2016

BY: 5537   006

FILED
Diana Alaniz

C2014-1453C
8/31/2016 4:30:29 PM
Heather N. Kellar
Comal County
District Clerk

CAUSE NO. C20141453C

| | | |
|---|---|---|
| BRYAN D. "DOUG" LIPPERT, JANE | § | IN THIS DISTRICT COURT |
| LIPPERT, JOSEPH CAMPBELL, ANITA | § | |
| CAMPBELL, RONALD "MAC" | § | |
| MCKINNON, AND COMAL TRACE | § | |
| HOME OWNERS ADVOCACY GROUP | § | 274TH JUDICIAL DISTRICT |
| | § | |
| VS. | § | |
| | § | |
| COMAL TRACE HOMEOWNERS | § | |
| ASSOCIATION | § | COMAL COUNTY, TEXAS |

## FINAL JUDGMENT

### (AMENDED)

This case was called for jury selection toward trial on June 6, 2016. All Plaintiffs and Comal Trace Homeowners Association, a Texas corporation ("Defendant" or "Association") appeared and proceeded to trial. A jury was summoned, qualified, and duly selected. After almost 3 ½ weeks of trial during which evidence was presented by all parties, the jury began deliberations on June 28, 2016. The jury's verdict was received on July 1, 2016. The Court signed a Final Judgment on July 29, 2016 but the Court amends same herein; as such, this supplants that Final Judgment signed on July 29, 2016. Based on the verdict of the jury, which is incorporated herein in full, and the applicable law, and the Court's disregarding the jury finding of mental anguish as to Plaintiff Joe Campbell (but otherwise separately overruling Defendant's motion for judgment notwithstanding the verdict), the Court makes the following findings and orders as part of its Final Judgment.

### THE ADVOCACY GROUP

1.     Plaintiffs Comal Trace Home Owners Advocacy Group ("Advocacy Group"), Bryan D. ("Doug") Lippert ("Doug Lippert"), Jane Lippert, Joseph ("Joe") and Anita Campbell, and Ronald "Mac" McKinnon jointly asserted various requests for declaratory and permanent

EXHIBIT

B

injunctive relief against Defendant Comal Trace Homeowners Association. Based on the findings of the jury, it is hereby ORDERED, ADJUDGED, and specifically DECREED under the Act as follows.

2.      Since January 1, 2013, the Association has improperly held one or more meetings of its Board of Directors in a matter that has been unvalild under the law, specifically §209.0051 if the Texas Property Code.  It is hereby ORDERED, ADJUDGED, and DECREED that Defendant Comal Trace Homeowners Association, Inc. and its board members and agents are PERMANENTLY ENJOINED from conducting any further meetings of its Board of Directors unless and until it has provided at least 72 hours' notice to its members or has otherwise complied with § 209.0051 of the Property Code, and said Association and its agents are PERMANENTLY ENJOINED from failing to conduct its proceedings and affairs meetings open to its membership unless justified going into executive session as narrowly set forth in of the Texas Property Code.  It is further ORDERED, ADJUDGED, and DECREED that if the Board of Directors of Comal Trace Homeowners Association appropriately goes into executive session, that the Board shall reconvene in open session incident to an open meeting and make such announcements as set forth in Section §209.0051 (c) of the Texas Property Code.

3.      Pursuant to Chapter 37 of the Texas Civil Practices and Remedies Code, and consistent with the jury's verdict, it is further DECLARED that the Comal Trace Homeowners Association has failed to keep minutes for one or more board meetings from January 1, 2013, to date in violation of the organizational documents of the Association and the Property Code. Incident to and in furtherance of the granting of such declaratory relief, it is hereby ORDERED, ADJUDGED, and DECREED that Defendant Comal Trace Homeowners Association and its board members and agents are hereby PERMANENTLY ENJOINED from conducting any

further meetings of its Board of Directors without compliance with the requirement that it keep minutes of all meetings.

4.      Pursuant to Chapter 37 of the Texas Civil Practices and Remedies Code, consistent with the jury's verdict it is further DECLARED that Comal Trace Homeowners Association's Architectural Control Committee ("ACC") has failed to keep minutes as required by Declaration and Bylaws of the Association, and has failed to place minutes in the minute books of the Association as required by the Association's bylaws.  Incident to the granting of such declaratory relief, it is hereby ORDERED, ADJUDGED, and DECREED that, unless the Bylaws and Declaration are hereafter validly amended to provide otherwise, Defendant Comal Trace Homeowners Association's ACC is hereby PERMANENTLY ENJOINED from failing to keep minutes of its deliberations and decisions and causing such minutes to be placed in the minute book of the Corporation (Association).

5.      Pursuant to Chapter 37 of the Texas Civil Practices and Remedies Code, and consistent with the jury's verdict, it is further DECLARED that the Association's Board of Directors improperly approved the Guidelines, implemented or used the Guidelines.  It is hereby ADJUDGED AND DECLARED that the Guidelines are void.  Incident to the granting of such declaratory relief, it is hereby ORDERED, ADJUDGED, and DECREED that Defendant Comal Trace Homeowners Association and its ACC and its agents are hereby PERMANENTLY ENJOINED from asserting the enforceability or applicability of the Guidelines issued in March, 2015 to any property encumbered by the Declaration in Comal Trace.   Defendant Comal Trace Homeowners Association is hereby ORDERED forthwith to cause the permanent removal or withdrawal of the Guidelines from the real property records of Comal County, Texas.

6.    Pursuant to 37.009 of the Texas Civil Practices and Remedies Code, consistent with the jury's verdict, it is hereby ORDERED, ADJUDGED, and DECREED that Plaintiff Comal Trace Home Owners Advocacy Group hereby awarded $40,000.00 in reasonable, necessary, equitable and just attorneys' fees through trial against Comal Trace Home Owners Association.  In addition, Plaintiff Comal Trace Home Owners Advocacy Group is additionally conditionally awarded $10,000.00 in reasonable, necessary, just and equitable fees should Defendant unsuccessfully appeal this Final Judgment for the Comal Trace Home Owners Advocacy Group to the Third Court of Appeals.  By way of an additional conditional appellate award of attorneys' fees, Plaintiff Comal Trace Home Owners Advocacy Group is additionally conditionally awarded $5,000.00 in reasonable and necessary fees should the Association unsuccessfully seek review before the Texas Supreme Court.

## THE LIPPERTS

7.    Plaintiffs Bryan D. ("Doug") Lippert and Jane Lippert own property at 187 Lost Creek Drive, Bulverde, Texas, 78163 ("Lipperts' Property) for which the deed was received in evidence.

8.    Based on the jury's findings, pursuant to Chapter 37 of the Civil Practices and Remedies Code (Declaratory Judgments Act), it is hereby ADJUDGED and DECLARED that the submission for the privacy fence by Plaintiffs Doug and Jane Lippert in November 2013 for an interior fence near the back of their property (so that it would be parallel to Highway 46) at the Lipperts' Property was denied in a manner that was arbitrary, capricious, and discriminatory by the Association's ACC, and is therefore void.   Consequently, the Court ADJUDGES and DECLARES that Plaintiffs Doug and Jane Lippert and their successors in interest may hereafter erect and maintain a cedar panel wood privacy fence in the stead and place where the current

King Ranch style no-climb fence is located on the Lipperts' Property (in conformity with the submission or Improvement Request Form that was introduced as P-14b).

9. Plaintiffs Jane and Doug Lippert sought attorneys' fees in connection with their claims under Chapter 37 of the Texas Civil Practices & Remedies Code (Declaratory Judgments Act), for which the jury made a finding that certain fees were reasonably and appropriately incurred. In accordance with the jury's and this Court's findings, it is hereby ORDERED, ADJUDGED and DECREED that Defendant Comal Trace Homeowners Association, Inc. be and is hereby liable to Plaintiffs Doug and Jane Lippert for the sum of **$168,000.00**, which sum represents just, reasonable, just and equitable attorneys' fees incurred by Plaintiffs in connection with the declaratory relief sought and obtained herein through trial.

10. IT IS FURTHER ORDERED, ADJUDGED, and DECREED that Plaintiffs are entitled to recover of and from Defendant Comal Trace Homeowners Association additional conditional appellate awards as follows. In addition, in the event of an unsuccessful appeal of this Final Judgment to the Court of Appeals by the Association, Plaintiffs Doug and Jane Lippert are entitled to recover an additional $10,000.00. By way of an additional conditional appellate award of attorneys' fees, Plaintiffs are entitled to an additional **$5,000.00** should the Association unsuccessfully seek petition for review before the Texas Supreme Court.

11. The Association had sought per diem damages and permanent injunctive relief against Doug and Jane Lippert as Counter-Defendants asserting their placing the windscreen on the current King Ranch "no-climb fence" was a material breach of the Restrictions. It is hereby ORDERED, ADJUDGED, AND DECREED that the Association TAKE NOTHING on its counterclaims against Doug and Jane Lippert. Consequently, the claims by the Comal Trace Homeowners Association seeking a permanent injunction to remove the current King Ranch no-

climb fence or windscreen thereon are DENIED and Counter-Plaintiff shall herewith TAKE NOTHING on its counterclaims for permanent injunctive relief, attorney's fees, and statutory penalty damages in connection with its counterclaims against Doug and Jane Lippert.

12.    Consistent with the jury's verdict, it is further ADJUDGED and DECREED that the Association wrongfully excluded the Lipperts from the open board of directors' meeting on January 27, 2015, and intentionally interfered with the Lipperts' peaceful use and enjoyment of the Lipperts' Property, and were defamed by the Association through its representatives or agents and/or its civil conspirators, thereby proximately causing damages to Plaintiffs Doug and Jane Lippert.  Specifically, Plaintiff Jane Lippert was found by the jury to have sustained $12,500.00 in mental anguish damages and Doug Lippert was also found to have been proximately caused $12,500.00 as a result of wrongful conduct found by the jury.  It is hereby ORDERED, ADJUDGED, and DECREED that Plaintiff Jane Lippert is hereby additionally awarded $12,500.00 against Defendant Comal Trace Home Owners Association for such mental anguish damages.  It is hereby further ORDERED, ADJUDGED and DECREED that Plaintiff Doug Lippert is hereby additionally awarded $12,500.00 against Defendant Comal Trace Home Owners Association for his mental anguish damages.

## THE CAMPBELLS

13.    Plaintiffs Joseph ("Joe") Campbell and wife Anita Campbell own property in Comal Trace known as 210 Crescent Lane, Bulverde, Texas, 78163 ("Campbells' Property") for which the deed to the Campbells was received in evidence.

14.    Based on the jury's findings, pursuant to Chapter 37 of the Texas Civil Practices and Remedies Code (Declaratory Judgments Act), it is hereby ADJUDGED and DECLARED

that the manner of the Campbells' parking and keeping of their 5th wheel /RV prior to February 2015 (a photo of same is at P-208 and D-208) was compliant with the Restrictions.

15.   Based on the jury's findings, pursuant to Chapter 37 of the Texas Civil Practices and Remedies Code (Declaratory Judgments Act), it is further ORDERED, ADJUDGED, and DECREED that in the event the Campbells elect to further screen their 5th wheel/RV on their property in Comal Trace, they may do so via the screening proposals set forth in the First or Second Submission to the Association's ACC, as the jury found that the denials or failures to approve each such submission was a result of an exercise of discretionary authority in a manner that was arbitrary, capricious or discriminatory.  Moreover, based on the jury's finding, and pursuant to Chapter 37 of the Texas Civil Practices and Remedies Code (Declaratory Judgments Act), it is further ADJUDGED and DECREED that the First Submission was also "deemed approved" under the Declaration for failure by the ACC to timely take up and rule on same.  As such, it is ORDERED, ADJUDGED, and DECREED that the express denials issued by the Association's management company on behalf of the Association or its ACC to Joe and Anita Campbell in connection with their First and Second Submissions are void.

16.   Plaintiffs Joe and Anita Campbell sought attorneys' fees in connection with their claims under Chapter 37 of the Texas Civil Practices and Remedies Code (Declaratory Judgment Act).  In accordance with the jury's findings and this Court's conclusions, it is hereby ORDERED, ADJUDGED, and DECREED that Defendant Comal Trace Homeowners Association, Inc. is liable to Plaintiffs Joe and Anita Campbell for attorneys' fees and money damages as set forth herein.  It is ORDERED, ADJUDGED, and DECREED that Plaintiffs Joe and Anita Campbell have and recover from and against Defendant Comal Trace Homeowners Association, Inc. the sum of **$102,000.00,** which sum represents just, reasonable and equitable

attorneys' fees incurred by Plaintiffs Joe and Anita Campbell in connection with the declaratory relief sought over the course of this case and obtained hereinabove. .

17.     IT IS FURTHER ORDERED, ADJUDGED, and DECREED that Plaintiffs Joe and Anita Campbell are entitled to recover of and from Defendant Comal Trace Homeowners Association additional conditional appellate attorneys' fees awards as follows. In the event of an unsuccessful appeal to the Court of Appeals of this Final Judgment by the Association, Plaintiffs Joe and Anita Campbell are entitled to recover an additional $10,000.00. By way of an additional conditional appellate award of attorneys' fees, Plaintiffs Joe and Anita Campbell are entitled and hereby conditionally awarded an additional $5,000.00 should the Association unsuccessfully seek a petition for review before the Texas Supreme Court.

18.     It is further ORDERED, ADJUDGED, and DECREED that the Association was negligent as against Joe and Anita Campbell that proximately caused them harm and damages. It was further found by the jury that Defendant Association via its representatives or agents and/or its civil conspirators or a combination thereof intentionally interfered with the peaceful use and enjoyment of the Campbells' Property, and defamed Joe and Anita Campbell. Specifically, Plaintiff Anita Campbell was found to have sustained mental anguish damages and additional storage costs relating to their 5th wheel as a proximate result of actionable wrongful conduct by the Association. It is hereby additionally ORDERED, ADJUDGED, and DECREED that Anita Campbell be and is hereby additionally awarded $10,000.00 over and against Defendant Comal Trace Home Owners Association for actual damages (mental anguish damages) as a proximate result of their conduct.    It is hereby ORDERED, ADJUDGED, and DECREED that Plaintiffs Joe and Anita Campbell are hereby additionally awarded $3,000.00 over and against Defendant Comal Trace Home Owners Association in additional damages for storage charges.

## RONALD "MAC" MCKINNON

19.    Plaintiff Ronald "Mac" McKinnon owns property in Comal Trace known as 170 Alvin's Way, Bulverde, Texas, 78163 ("McKinnon's Property) for which the deed to Mr. McKinnon was received in evidence.

20.    Based on the jury's findings, and pursuant to Chapter 37 of the Texas Civil Practices and Remedies Code (Declaratory Judgments Act), it is hereby ADJUDGED and DECREED that the denials by the Association or its ACC to deny Plaintiff McKinnon his requested structural side set back variance of 14 feet to build a 14 by 16 foot structure are hereby rendered void; specifically, pursuant to the Declaratory Judgments act it is hereby DECLARED that the Association or its ACC exercised its discretion in denying the variance in a manner that was arbitrary, capricious or discriminatory, effectively rendering the denials void and tantamount to approval for such proposed building as placed within 14 feet of the side set back as indicated in Plaintiff McKinnon's submissions.

21.    Plaintiff Ronald "Mac" McKinnon sought attorneys' fees in connection with his claims under Chapter 37 of the Texas Civil Practices and Remedies Code (Declaratory Judgment Act). In accordance with the jury's findings and the conclusions of this Court, it is hereby ORDERED, ADJUDGED and DECREED that Defendant Comal Trace Homeowners Association, Inc. is liable to Plaintiff Ronald "Mac" McKinnon for attorneys' fees; specifically, it is hereby ORDERED, ADJUDGED, and DECREED that Plaintiff Ronald "Mac" McKinnon have and recover from and against Defendant Comal Trace Homeowners Association, Inc. the sum of $51,000.00, which sum represents a just, reasonable and equitable attorneys' fees incurred by Plaintiff McKinnon in connection with the declaratory relief sought over the course of this case and obtained hereinabove.

22.     IT IS FURTHER ORDERED, ADJUDGED, and DECREED that Plaintiff Ronald "Mac" McKinnon is entitled to recover of and from Defendant Comal Trace Homeowners Association additional conditional appellate awards for attorney's fees as follows.   In the event of an unsuccessful appeal to the Court of Appeals of this Final Judgment by the Association, it is hereby ORDERED, ADJUDGED, and DECREED that Plaintiff Ronald "Mac" McKinnon is entitled to recover an additional $10,000.00.   By way of an additional conditional appellate award of attorneys' fees, it is hereby additionally ORDERED, ADJUDGED, and DECREED that Plaintiff McKinnon is entitled to an additional $5,000.00 should the Association unsuccessfully seek a petition for review before the Texas Supreme Court.

23.     Consistent with the verdict, it is further ADJUDGED that Defendant Association via its representatives or agents defamed Mr. McKinnon proximately causing him damages, among other things, falsely accusing him of criminal misconduct.   It is hereby ORDERED, ADJUDGED, and DECREED that Plaintiff Ronald "Mac" McKinnon is hereby additionally awarded $10,000.00 against Defendant Comal Trace Homeowners Association for mental anguish damages.

### MISCELLANEOUS – ALL PARTIES

24.     It is FURTHER ORDERED, ADJUDGED and DECREED that all writs and processes for all Plaintiffs to enforce and collect this Final Judgment, including court costs, may issue as necessary.

25.     The Court further ORDERS, ADJUDGES, and DECREES that Plaintiffs Doug and Jane Lippert, Joe and Anita Campbell, Ronald "Mac" McKinnon, and the Comal Trace Home Owners Advocacy Group are entitled to and are hereby additionally AWARDED all court

costs of court against the Defendant Comal Trace Homeowners Association, which amount is $12,473.45 owed jointly to all Plaintiffs.

26.    As to the total monetary award to all Plaintiffs awarded above, which totals **$421,473.45** (which includes court costs), it is further ORDERED, ADJUDGED, and DECREED that Plaintiffs shall have post-judgment interest at the rate of 5% per annum until said amount until paid in full, which interest obligation is hereby assessed against Defendant Comal Trace Homeowners Association, Inc. in favor of all Plaintiffs.

27.    This Final Judgment is intended to be a full and final judgment disposing of all parties, claims, and causes of action tried in this cause; all relief not expressly awarded by this judgment to Plaintiffs or to Defendant/Counter-Plaintiff Comal Trace Homeowners Association is hereby DENIED in all things.

SIGNED this 24th day of August 2016

DIB WALDRIP JUDGE PRESIDING

APPROVED AS TO FORM ONLY:

LANGLEY & BANACK, INC.
Trinity Plaza II, Ninth Floor
745 East Mulberry
San Antonio, Texas 78212-3166
(210) 736-6600 – Telephone
(210) 735-6889 – Telecopier


By: _____
PETER L. KILPATRICK
State Bar No. 11416545

ATTORNEYS FOR PLAINTIFFS

ADAMI, SHUFFIELD, SCHEIHING &
BURNS, P.C.


By: _____
GRANT E. "TRES" ADAMI, III
State Bar No. 00845400
tadami@adamilaw.com
SWBC Tower
9311 San Pedro Avenue, Suite 900
San Antonio, Texas 78216
210-344-0500 – Telephone
210-344-7228 – Fax

ATTORNEYS FOR DEFENDANT COMAL TRACE
HOMEOWNERS ASSOCIATION


ALLEN STEIN & DURBIN, P.C.
6243 IH-10 West, Suite 700
San Antonio, Texas 78201
(210) 734-7488 – Telephone
(210) 738-8036 – Facsimile

TOM L. NEWTON, JR.
State Bar No. 14982300
ASHLEY E. GIORDANO
State Bar No. 24087589
KATIE E. FAULK
State Bar No. 24087500

ATTORNEYS FOR DEFENDANT / COUNTER-
PLAINTIFF COMAL TRACE HOMEOWNERS
ASSOCIATION

RECEIVED

MAR - 8 2016

BY: 5537  006

CAUSE NO.  C20141453C

| | | |
|---|---|---|
| BRYAN D. "DOUG" LIPPERT, JANE | § | IN THIS DISTRICT COURT |
| LIPPERT, JOSEPH CAMPBELL, ANITA | § | |
| CAMPBELL,  RONALD McKINNON | § | |
| and COMAL TRACE HOME OWNERS | § | |
| ADVOCACY GROUP | § | 274TH JUDICIAL DISTRICT |
| | § | |
| VS. | § | |
| | § | |
| COMAL TRACE HOMEOWNERS | § | |
| ASSOCIATION | § | COMAL COUNTY, TEXAS |

## PLAINTIFFS' FIFTH AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES BRYAN D. "DOUG" LIPPERT et ux. JANE LIPPERT,  JOSEPH W.

CAMPBELL and ANITA H. CAMPBELL, RONALD NORMAN McKINNON and COMAL

TRACE HOME OWNERS ADVOCACY GROUP (sometimes "CTHOAG" herein), who

complain of the Defendant Comal Trace Homeowners Association ("Defendant" or

"Association") as set forth below.  This petition removes some causes of action from the Fourth

Amended Petition as supplemented and clarifies some allegations; it does not seek to add any

new cause of action. As such, it is the understanding of Plaintiffs' counsel that there is no

objection to the filing of this Petition after the pleading closure date.   If that is a

misunderstanding, Plaintiffs move for leave for such filing or reconsideration.

### DISCOVERY LEVEL

1.

Discovery in this case is intended to be conducted under Level 3 for which a scheduling

order has been presented to the Court.

L & B 18454/0002/L1064090.DOCX/                                   - 1 -





<u>CLAIM FOR RELIEF: STATEMENT PER TRCP 47</u>

2.

Pursuant to TRCP 47, the damages sought in this cause are within the jurisdictional limits of this Court. More specifically, although subject to amendment, per TRCP 47(c)(2), Plaintiffs seek attorneys' fees and/or monetary damages of over $100,000 but not more than $1,000,000, and non-monetary relief (to-wit, equitable relief pursuant to the Declaratory Judgment Act and injunctive relief set forth herein). Plaintiff CTHOAG seeks only declaratory and injunctive relief, and recovery of its attorney fees. While the above is styled as an amendment, it is a supplement to the extent of incorporating herein the prior verifications for injunctive relief.

<u>PARTIES AND SERVICE OF CITATION</u>

3.

Defendant is before the Court. Comal Trace Homeowners Association, hereinafter "Defendant Association" or "Association," is a Texas Corporation. Individual Plaintiffs are individuals who reside in Comal County, whose homes are subjected to certain restrictions for which Defendant Association erroneously asserts or threatens various violations. Individual Plaintiffs are also members of the Association. Plaintiff CTHOAG is a Texas non-profit unincorporated association whose members is comprised of property owners and residents of Comal Trace, and/or are members of Defendant Association whom the Association was originally chartered to serve.

<u>JURISDICTION, STANDING, AND VENUE</u>

4.

The subject matter in controversy is within the jurisdictional limits of this Court. In fact, the legal damages sought far exceed the minimal jurisdictional limits of this Court. The

equitable and declaratory relief sought herein is also within the Court's jurisdiction. Defendant is subject to the *in personam* jurisdiction of this Court. CTHOAG has standing as it is comprised of Individual Plaintiffs and members of the Association whose property rights and other rights as members of the Association have been abridged, affected, compromised, or violated as set forth herein. No individuals of CTHOAG are parties herein unless such members are also specifically named as individual Plaintiffs above. However, the CTHOAG's membership, undermined by anonymous communications spiteful of Individual Plaintiffs (at least one of which on information and belief was promoted by one or more members of the Board), are concerned about similar retaliatory communications.

### CLARIFICATION OF CLAIMS AGAINST CHRIS ELDRIDGE

5.

Only Plaintiffs Doug and Jane Lippert seek claims personally against Chris Eldridge, which claims are currently on appeal. No Plaintiff in this live pleading sues Chris Eldridge individually.

### FACTS AND CAUSES OF ACTION

6.

Individual Plaintiffs own properties governed by the Declaration of Covenants, Conditions, Easements and Restrictions, Comal Trace Subdivision and Comal Trace Owner's Association, executed October 23, 1997, filed of record at Document Number 9706022421 of the Real Property Records of Comal County, Texas, hereinafter sometimes referred to as the "Declaration" or "Restrictions," which covers Units 1, 2 and 4. As such, CTHOAG's interest is Subdivision-wide as its members' interests are not limited to properties covered by the

Declarations in just Units 1, 2, and 4 or just the ACC chaired by Richard Sommer, but all of the Subdivision.

*ACC*

7.

Pursuant to the Declaration, the Association has an Architectural Control Committee (hereinafter "ACC").   Pursuant to the Declaration, the ACC "shall be under the jurisdiction of the Board of Directors" and said "committee shall receive its orders from the Board and shall follow the guidelines in reporting to the Board as deemed necessary by the Board" of Directors for the Association.   As such, the ACC is under the jurisdiction and control of the Association. The conduct or inaction of the ACC is conduct or inaction of the Association.

8.

The Association's Board of Directors also appoints and removes ACC members pursuant to the Declaration.   Per the bylaws, the committee may "exercise such powers as the Board of Directors may determine...."   On occasion the Board or one or more of its members have unilaterally authorized several "close outs" of some covenant violations without a vote by the ACC or Board of Directors.

9.

There are two ACCs at the Subdivision.   The ACC governing that part of the Subdivision regarding the Declaration covering the Individual Plaintiffs' properties was chaired by Lee Allman and then subsequently by Richard Sommer.   Mr. Sommer was also on the Board of Directors of the Association until late 2014.   The "other" ACC is called "The Heights" ACC, which covers other portions of the Subdivision in which the Individual Plaintiffs do not reside.

10.

An ACC is supposed to meet and contemporaneously deliberate in a proceeding in the same manner where one member of the ACC can have an opportunity to change another's mind as when the Board of Directors of the Association meets, although without the notice requirements. One member of the ACC is Individual Plaintiff Ronald "Mac" McKinnon. In fact, pursuant to the Bylaws, the ACC "shall keep regular minutes" of it proceedings and, when required by the Board, "report the same to the Board of Directors." Pursuant to Section 6 of Article VII of the Bylaws of the Association, the minutes of the committee proceedings shall be placed in the minute books of the Corporation."

11.

No meeting or "proceeding" was held by the ACC at which the members deliberated and voted on any of the issues for the Individual Plaintiffs. As of November 1, 2015, no ACC meeting was held where minutes were kept and placed in the minute books of the Corporation. As such, the Association's attempts to deny the requested improvements of the Individual Plaintiffs is void, all such submittals are deemed approved, and/or any disapproval is void as the result of arbitrary, capricious or discriminatory processes and/or exercise of discretion in contravention of the Declaration and/or Bylaws of the Association and/or Texas Property Code.

12.

Plaintiff CTHOAG desires transparency and consistency in the Association's control and conduct of the ACCs. Plaintiff CTHOAG and Individual Plaintiffs seek declaratory and permanent injunctive relief that requires future ACC meetings to comply with the Bylaws, and to require that the deliberations of the ACC be recorded via minutes as required by the Bylaws, and that requires the Association to make such minutes reasonably available to the membership, and

to require that the minutes be placed in the minute books of the Corporation as required. Plaintiffs seek their attorneys' fees and costs under Chapter 37 and/or 38 of the Texas Civil Practices and Remedies Code in connection with such relief, as well as Article XII, Section 4 in the Declaration (Attorney's Fees) at page 20:  If any controversy, claim, or dispute arises relating to this Declaration, its breach, or enforcement, the prevailing party shall be entitled to recover from the losing party reasonable expenses, attorneys' fees, and costs.  Plaintiffs seek such fees.

### *The ACC can give Variances and the Board of Directors May Overturn ACC decisions*

13.

The ACC can grant variances.  The Board of Directors can overturn ACC decisions. However, shockingly, these fundamental notions set forth in the Declaration and law are not agreed to or understood by Defendant.  Chris Eldridge, Defendant's representative and President for most of the time relevant in this matter previously testified and asserted -- erroneously -- that the Association cannot overturn a decision of the ACC.  Plaintiffs seek declaratory relief that the ACC has the power to grant variances (such as in the case of Mr. McKinnon) and that the Board has the power and authority to overturn an ACC decision denying an improvement, and indeed has the responsibility under the Texas Property Code to independently consider a decision denying an improvement when a homeowner requests such reconsideration or appeal.  The Lipperts were denied such an appeal as to their privacy fence.  All Plaintiffs seek their attorney's fees in connection with such declaration.

### *Guidelines and Interpretations of DCCRs*

14.

Pursuant to the Declaration and the law, an extra-majority percentage is required to amend the Restrictions.  As such, it was intended to require an extra-majority of the owners at a

validly-called meeting of the membership to amend the Restrictions to provide for new or more onerous land use restrictions.

<div align="center">15.</div>

Individual Plaintiffs and many other owners in the Subdivision bought their properties recognizing the limitations of the land use restrictions in Declarations, understanding that any ambiguity should be resolved in favor of the free and least-restricted use of one's property. Individual Plaintiffs bought their properties with the understanding that land use restrictions or covenants could not be made more onerous unless an extra-majority of the membership voted to amend the restrictions to make them more restrictive and onerous. However, Defendant Association has improperly sought to do an "end run" around the requirement of amending the restrictions by asserting more onerous requirements via Guidelines issued in or about February or March 2015.

<div align="center">16.</div>

The 2015 Guidelines were not voted on by the membership or made part of any amended Declaration following the procedures in the Bylaws of the Association. Further, pursuant to the deposition of CTHOA's representative Chris Eldridge, who was President during the relevant time, the Guidelines were never the subject of an agenda item for a regular or specially called meeting of the Board of Directors. The Defendant issued and sent the Guidelines to all members without notice. Defendant now indicates they were only suggestive or aspirational but that is not how they were presented to the membership. Defendant or its agent even recorded the Guidelines and to date they have not been removed or released as a document that is being held as to the public as having some kind of binding effect.

17.

Defendant has admitted there was no vote taken by the Board of Directors at all on the adoption of the Guidelines at a regular or special meeting of the Board of Directors. Rather, the Defendant Association's Board asserts by various discussions and emails between board members that the Guidelines were simply "adopted" without a vote. This process was in violation of the Texas Property Code's "open meeting" and other requirements. As such, the Guidelines sent to the membership on or about March 2015 are void and of no force and effect, either as binding or aspirational. Even if one engaged in the fiction that the Guidelines were Board action, it would be ineffective as it seeks on its face to provide for land use limitations that are more onerous than is legally allowed under the Declaration.

18.

The Guidelines were not adopted or enacted or recorded before any Individual Plaintiff acquired its property. The Guidelines were not adopted or enacted or recorded before submissions by the Campbells and Lipperts. Indeed, it appears Defendant had in mind the Campbells and/or Lipperts when trying to make the Guidelines a further basis to support the denials of their submissions. The Guidelines purport, for example, to bar homeowners from having anything ("NOTHING" is the exact word, in capital letters) located in the structural setbacks of their property, even if not a permanent structure. Even if one engaged in the notion that the Guidelines were validly adopted by the Association by proper process and vote, they are not amendments to the Declaration. Defendant did not disclose to the membership that the Guidelines meant nothing or was only suggestive.

19.

The Guidelines state that "NOTHING (screening, buildings, boats, trailers, RVs, etc.) will be approved to be built, stored, or located within the property setbacks." As if to drive home the point, the word "NOTHING" was capitalized. Such directive, if it had the power of a covenant, or could "clarify" a covenant, would make for ridiculous results. Plaintiffs and the homeowners who comprise CTHOAG did not sign up for such results when they purchased their properties. The Guidelines also sought to make more onerous covenants relating to "screening" items such as the Campbells' RV. No screening is barred within the structural property setbacks in the Declaration. Moreover, temporary screening of one's back yard by a windscreen is not even an item of construction or improvement that requires submission and approval.

20.

The Defendant caused the Guidelines to be promulgated and issued. Its position is now that it did not authorize the recording of same although done by its agent and recording costs paid for by the Association. However, the Board has not authorized any notification to the membership withdrawing the Guidelines or withdrawing the Guidelines in a recording with the Comal County Clerk.

21.

Plaintiffs seek their attorneys' fees and costs under Chapter 37 and 38 of the Texas Civil Practices and Remedies Code in connection with such relief, as well as the Declaration itself. Individual Plaintiffs and Plaintiff CTHOAG also seek declaratory relief herein that Guidelines are 1) not binding, and 2) whether aspirational or binding, were not validly voted on or adopted by the Board. Plaintiffs further seek a temporary restraining order, temporary injunction, and/or permanent injunction against Defendant from enforcing the Guidelines, or purporting to assert it

represents any official board action or clarification of the Declaration given that it was not born of a valid process and vote at a public meeting of the Board.

22.

Some Plaintiffs have been erroneously told by Association representatives that whenever a provision in the Declaration is ambiguous, it must be "strictly construed" in favor of the strictest application against the homeowner – that is legally an erroneous position by the Association.  Indeed, Plaintiffs further seek a declaration and permanent injunctive relief against the Association and its ACCs that whenever confronted by ambiguous provisions reasonably subject to more than one reasonable interpretation, the interpretation that Defendant ought to apply is the one that is *least restrictive* to a property owner and results in the freer use of one's property.  Freer use of property, not a more restrictive use, is the appropriate interpretation protocol.

### *Improper Electioneering by Association*

23.

Plaintiff CTHOAG is interested in fair elections of the Directors of the Association.  The Association itself ought not to be involved in electioneering, but neutrally administering fair elections.

24.

In the notice for the Annual Meeting which was sent out by the Defendant Association at Association expense on or about August 20, 2015, such mailing improperly included a proxy with the name "Chris Eldridge, President of Comal Trace Home Owners Association, Inc." pre-printed in as the only proxy choice listed by name.  Electioneering by the Board of the Directors of Defendant is not appropriate.

25.

Including such a proxy (to-wit, with the pre-printed approval of Chris Eldridge as President as a proxy candidate) at Association expense was completely improper. The proxy should simply have been a blank as to the proxy candidate for the member to choose without being steered by the Association to Eldridge, with it being clear that a member is not required to send in any proxy at all.

26.

Plaintiffs cannot discern from attending meetings of the Board of Directors or from reviewing minutes of the Board where the Board even took up and decided to issue a proxy form with Eldridge as President of the Association being specifically pre-printed as a proxy holder. No notice was given to the membership of any agenda item that such matter was even taken up. The Defendant Association conducts the election - it ought not seek to control its outcome by soliciting proxies for its President and then having such person cast such proxy votes <u>as an officer of the Association</u>.   Moreover, the scope of Chris Eldridge's role in the bylaws as President does <u>not</u> include casting ballots for other members in his capacity as President, which is how the current proxy is worded. As such, such activity would be void.

27.

If Eldridge or any other officer or Board member of the Defendant wishes to solicit proxies individually for his use at any annual meeting of the Association, Plaintiffs do not dispute their right to do so; however, they should do so on their own time and at his own expense, not with sanction of the Association or at any mailing or other costs to the Association. Defendant Association was put on notice that Plaintiff CTHOAG opposed this electioneering tactic well in advance of the scheduled meeting of the annual membership on September 22,

2015. CTHOAG's Manager sought to address this without having to resort to litigation. Such courtesy notice dated September 8, 2015 gave Defendant Association an opportunity to reform its conduct and Eldridge an opportunity to obtain his own proxies (on his own time and at his own cost without sanction or sponsorship of the Association) in advance of the election if that is his desire. CTHOAG urged through its counsel by fax dated September 11, 2015 that the Association cease using the proxy and acknowledge it would not count same. Defendant plowed ahead anyway utilizing the proxies marked for Eldridge. Whether such practice may have affected the outcome in this particular instance is not the issue. The issue is to make sure that does not happen again.

<div align="center">28.</div>

Plaintiffs and Plaintiff CTHOAG would be irreparably harmed if the Board is allowed to control the outcome of the election as a result of such improper electioneering. Defendant Association has indicated it does not intend to change such practice. All Plaintiffs seek permanent injunctive relief against Defendant Association from 1) spending monies to seek proxies for use by an officer or member of the Board of the Association for the purposes of voting as a member of the board or officer of the Association, and from 2) counting any proxy votes cast by an officer or member of the Board that is sought to be cast as an officer of the Association.

<div align="center">29.</div>

Plaintiff CTHOAG also seeks permanent injunctive relief against Defendant Association hereafter issuing a proxy with an officer provided as a pre-printed proxy holder to vote proxies as an officer of the corporation.

<u>*Association's Board Purporting to Take Board Action*</u>
<u>*by e-Mail and Secret Meeting without Notice to Members as Required by Law*</u>

30.

Plaintiff CTHOAG and Individual Plaintiffs also have a vested interest in making sure that its Association follows the law when it comes to open meeting and appropriate board action. When the Board meets - whether at a regular or special meeting - it must first notify the membership (unless the limited provisions of Texas Property Code § 209.0051(h) are expressly adhered to and met) as required by law.  There have been improper secret Board meetings and there has been action taken without a Board vote or agenda item discussing same (*i.e.*, the Guidelines above as an example).  Further, Defendant has caused prior purported action of the Board to occur without notice to the membership, by attempting to have an e-mail vote that itself is improper under the law.  Further, even when the Board meets in executive session, it must do so in connection with a validly - called regular or special meeting of the Board of Directors and, upon completion of the session, return to open session with any announcements as required by the Texas Property Code.  Defendant has failed to follow the law in such regard.

31.

The Defendant Board has had a number of secretive board meetings, including at the homes of board members Bernadina Mickey and Chris Eldridge, to discuss or take up Association business.  No notice was given to the members of the Association or Plaintiffs as to such meetings.

32.

The Texas Residential Property Owners Protection Act, which applies to the Association, provides that both regular and special board meetings must be open to owners.  TEX. PROP. CODE

§ 209.0051(c); *see* TEX. PROP. CODE § 209.003.   To effectuate this, members must be given notice of the date, hour, place and general subject of a regular or special board meeting.  TEX. PROP. CODE § 209.0051(e).   Such notice must be either (1) mailed to each property owner not later than the 10th day or earlier than the 60th day before the date of the meeting; or (2) provided at least 72 hours before the start of the meeting by either posting the notice in a conspicuous manner reasonably designed to provide notice to the HOA's members or sending the notice by e-mail to each owner who has registered an e-mail address with the association.  *Id.*  There are limited exceptions to this notice requirement.  But the Defendant as the executive leadership of the Association has misapplied this exception.  The board of any residential property owners association may "meet by any method of communication, including electronic and telephonic, without prior notice to owners . . . <u>if</u> each director may hear and be heard by every other director, or the board may take action by <u>unanimous written</u> consent to consider routine and administrative matters or a reasonably unforeseen emergency or urgent necessity that requires immediate board action."  TEX. PROP. CODE § 209.0051(h). Emphasis Added.   These exceptions are further narrowed by the restriction that prior notice to owners can never be waived under certain circumstances.  Any executive session must be incident to a validly called meeting with notice to the membership and any business taken up appropriately in executive session (very limited matters can be taken up in executive session) must then come back into open session and summarize the decisions made to the membership.

<div align="center">33.</div>

Plaintiff CTHOAG seeks transparency and seeks declaratory relief that conduct since January 1, 2014 engaged in by the Association was and is violative of the Open Meetings

provision of the Texas Property Code, the notice provisions in the Code, and the prohibition against electronic meetings without opportunity for contemporaneous deliberation.

34.

Defendant Association has erroneously asserted that e-mail exchanges and e-mail votes by Board members – without notice to the membership and not equivalent to an electronic meeting with contemporaneous deliberation, and without unanimous written consent – is board action.

35.

Plaintiff CTHOAG seeks transparency and that such conduct was and is violative of the Open Meetings provision of the Texas Property Code, the notice provisions in the Code, and the prohibition against electronic meetings without opportunity for contemporaneous deliberation. Plaintiffs seek temporary and permanent injunctive relief that Defendant Association cease violating the law as to such matters in this section.  As to all injunctive relief sought herein, Plaintiffs would be irreparably harmed if Defendant continues to violate the law as the integrity and legality of its Association's deliberations and purported actions should be compliant with and not violative of the law.  Further, Individual Plaintiffs and the property rights of members of the CTHOAG will be negatively affected if the Association's appointments, resolutions, and purported board action is void or legally in question.

*Defendant Association Improperly Excluding Members*
*From Attending Board Meetings*

36.

Article IV (Membership)'s Section 6 states that if an owner is "involved in litigation with the Corporation as to a "conflict of interpretation of the Declaration," and other specific issues,

such as delinquent assessments, the owner is not a member "in good standing and may not participate in any Corporation meeting or activity." But the law requires open meetings of the Board of Directors. The Texas Residential Property Owners Protection Act, which applies to the Association, provides that both regular and special board meetings must be open to owners. TEX. PROP. CODE § 209.0051(c); *see* TEX. PROP. CODE § 209.003. The law prohibits exclusion of Association activities or suspension of privileges based on lack of alleged "good standing." Covenants that purport to exclude members or deny them from running for the Board or attending Board meetings because they are in arrears of assessments or in violation of restrictions has been superseded by statute for years.

37.

Further, when a member is excluded from other privileges, such as use of common areas, except in some circumstances not applicable here, the law allows for an opportunity first for a hearing before a suspension of such privileges. Yet on January 27, 2015, the Board of Directors and Chris Eldridge broke the law – despite express admonitions by Tina Jameson – its own property association management official engaged by the Association through C.I.A. Services with over 30 years of association management experience. Even if Ms. Jameson, Defendant's own agent at the relevant times, was lying in her deposition, Defendant had access to various counsel pending in this very lawsuit when Defendant accomplished the exclusion.

38.

On January 27, 2015, the Lipperts had been sitting for almost 30 minutes waiting for the Board meeting to begin. The Lipperts were not unruly. They did not force any "participation" role in the meeting. Neither had they planned to hijack any kind of agenda from the Board. They planned to attend as they had attended prior board members – as interested members of the

Association.  But on this night, the Lipperts would become victims of Defendant's misconduct and agenda to shame and humiliate the Lipperts.

<div align="center">39.</div>

The Lipperts as members of the Association were directed to leave the board meeting on the eve of it starting.  They were directed to leave by the Association's President, Chris Eldridge. Eldridge directed the Lipperts to leave with full knowledge and consent by the Association's Board of Directors.  They were directed to leave after Ms. Jameson of CIA, an association management professional with over 30 years of experience, admonished Eldridge not to exclude the Lipperts.  Eldridge did not raise this idea of excluding the Lipperts on the night of the Annual Meeting as he falsely testified in his deposition; rather, he was floating the idea weeks before.

<div align="center">40.</div>

Even if the Lipperts planned to "participate" in the meeting, Defendant was apprised by its professional management representative Tina Jameson from CIA Services that the provision Defendant was relying on was *not enforceable* under the law.  Defendant proceeded anyway to exclude the Lipperts.  The Lipperts were given no notice or opportunity for a hearing to suspend their membership rights and privileges – they were just told to leave.  Defendant broke the law at multiple levels.

<div align="center">41.</div>

Eldridge, after excluding the members, then announced the Lipperts exclusion to over 30 other members of the community in attendance.

<div align="center">42.</div>

While the Lipperts were the most direct victims of such misconduct, with the embarrassment and opprobrium attendant to being directed out of a meeting attended by over 30

of their neighbors, all Plaintiffs, including Plaintiff CTHOAG, have an interest in seeking relief so that such an exclusion of members by the Association is not repeated again on another member of the Association who may disagree with the Association or its officers.  Plaintiffs seek declaratory relief that Section 6 of Article IV is not a basis to exclude any member from hereafter attending any meeting of the Board of Directors or from even participating in same, even if "involved in litigation" or otherwise alleged not to be a member "in good standing."

43.

Plaintiffs CTHOAG and all Individual Plaintiffs seek a permanent injunction against Defendant Association and its agents from excluding not only the Lipperts but any other member of the Association in any future meeting of the Board of Directors, special meeting of the Board of Directors, or Annual Meeting of the membership, based on a member being involved in litigation with the Association.

*Restrictions; Ambiguity*

44.

Pursuant to a recent opinion by the Third Court of Appeals in Austin that overturned a summary judgment that the Honorable Judge Dib Waldrip granted for a Comal County homeowners association, in *Zgabay vs. NBRC Property Owners Association* (Comal Chase HOA in Comal County), decided in August 2015 at No. 03-14-00660-CV, the Court stated "when a restrictive covenant may reasonably be interpreted in more than one way, it is ambiguous, and we will resolve all doubts in favor of the free and unrestricted use of the property, strictly construing any ambiguity against the party seeking to enforce the restriction.  *Wilmouth v. Wilcox*, 734 S.W.2d 656, 657 (Tex. 1987); *Hicks v. Falcon Wood Prop. Owners Ass'n*, No. 03-09-00238-CV, 2010 WL 3271123, at *7 (Tex. App. – Austin Aug. 19, 2010, no pet.)  (mem.

op.)." This is just one of many cases in support of such proposition. Numerous provisions in the Restrictions regarding fencing, landscaping, RVs, and setbacks are ambiguous. Further, some of the land use limitations urged by Defendant does not even involve an appropriate grant of discretion, and is violative of *Davis vs. Huey.*

<div align="center">

*Doug and Jane Lippert*

45.

</div>

Plaintiffs Bryan D. Lippert and Jane Lippert (hereinafter sometimes collectively referred to as the "Lipperts") are the owners of real property within the Defendant's Subdivision regime located at 187 Lost Creek Dr., Bulverde, Texas 78163 and legally described as Comal Trace 1, Lot 2, acres 1.96 in the Real Property Records of Comal County, Texas, hereinafter referred to in this section of the lawsuit relating to the Lipperts as the "Lipperts Property" or just "Property"

<div align="center">

46.

</div>

Fences made with certain materials are essentially pre-approved in the Declaration; however, the Architectural Control Committee otherwise has authority to provide approval for any other fencing, and has previously authorized various types of fencing, including privacy fencing.

<div align="center">

47.

</div>

Throughout 2013, the Lipperts began to experience an escalation of issues on their property which were directly caused by the visibility of their backyard to Highway 46. Specifically, motor vehicle drivers frequently stopped behind their residence and would "cat-call" to their daughter, make lewd comments, and/or yell other inappropriate statements at the Plaintiffs' then-ten year old daughter while she was in the back yard or later using the swimming pool. Plaintiffs also witnessed instances in which motor vehicle drivers would stop in the vacant

area behind the Plaintiffs' property to discharge firearms (*i.e.* target shooting). Beer bottles were hurled into Plaintiffs' back yard from motorists on Highway 46. Plaintiff's daughter has additionally been hampered in her home schooling classes due to the absence of a privacy barrier in her backyard. Traffic was increasing. Hazards emanating from the traffic were increasing. Strangers would stop at the edge of Highway 46 near the back of the Lipperts home. Gunshots have been heard emanating from motorists from or near Highway 46 and reported to police authorities. TX-DOT was assessing expanding the busy highway to multiple lanes (for which it has now announced plans to do so).

48.

Mr. Lippert contacted the ACC about submitting for an 8 foot privacy cedar fence, but the Lipperts were flatly told by the ACC that it would never approve an 8- foot solid cedar wood privacy fence. Plaintiff was told, erroneously, by the Defendant's representatives that 8 foot fences were barred as anything over 6 feet tall was violative of the Restrictions. Consequently, Mr. Lippert submitted a 6 foot privacy fence for approval.

49.

Specifically, in the time frame of November, 2013, the Lipperts made proper requests for improvements, directed to the Defendant Association's ACC as required under the Declaration, to include a 6-foot cedar privacy interior fence across approximately the back third of their property, along with the installation of a row of Arizona Cypress trees and Wax Myrtle shrubs next to the privacy fence. The intent behind such requests was that the trees/shrubs could take years to fill in, but would obscure the privacy fence from all views other than possibly from Highway 46, which is not a Subdivision street.

50.

The Lipperts do not access and cannot access their property from Highway 46.   The Lipperts believed their request would generally increase their property value while simultaneously creating a barrier for security and privacy at the back of their property, and because it would provide for the required screening for yard equipment, a clothes line, and material piles as required in the Declaration.

51.

The Declaration does not prohibit a privacy fence.  Yet the Committee denied it because – it said erroneously - privacy fencing was    barred by the Restrictions.   The Defendant Association's representatives denied the request for a privacy fence in December, 2013, while approving the landscaping request for the Arizona Cypress trees and Wax Myrtle shrubs in the back yard.   Surprisingly, the ACC denied also the request as to approximately nine (9) Crepe Myrtles in their front yard.   The Lipperts submitted the shrubs for approval after the fact as they were not aware the ACC expected to approve plantings that did not materially change the topography of their property.   Indeed, neighbors and many other members not named Lippert have made many plantings without submission to the ACC and without receiving notices of violation from the Association.

52.

Defendant Association initially supplied no substantive explanation for the decisions of the ACC denying the privacy fencing and shrubs in the front yard of the Lipperts.

53.

On or about December 13, 2013, Defendant Association's agent ACC by and through representative Chairman Lee Allman, agreed via e-mail to provide "more detail" for the

decisions [denials] made by the ACC; however, rather than providing specific reasons for the denial of the privacy fence, the Defendant Association's ACC merely stated that "The DCCR [Declaration] does not allow privacy fences and the ACC is unwilling to change the original decision to deny a privacy fence in your backyard." That is entirely false. A review of the entire Declaration confirms that not only are privacy fences not expressly disallowed – they are not even mentioned in the language of the document. The Lipperts allege that such exercise of discretion by Defendant's ACC to deny the privacy fencing and denying the Crepe Myrtles in the front yard was arbitrary, capricious, or discriminatory, for which Plaintiff Lipperts seek such declaratory relief that such action denying approval as to the November 2013 submission is void.

54.

The Association did not provide for an appeal of the denial of the requested 6 foot cedar privacy fence in violation of the law.

55.

The ACC proposed and approved the no-climb King Ranch style mesh fence that the Lipperts thereafter built as it was the only alternative provided and was the lesser of two evils to have a fence an inadequate fence as opposed to no fence at all near the back portion of their lot along Highway 46. The Lipperts could hope to have vegetation mature in years to provide some needed privacy and at least the fence offered some security. The Lipperts caused a no-climb King Ranch fence suggested by the ACC. The Lipperts installed the fence and received no complaint for over approximately 6 months (when a temporary screening material was tied onto such fence to add privacy as set forth in more particularity below). The fence was situated

approximately 25 feet from the deteriorated, damaged, and climbable fencing near the perimeter of the back of the Lipperts' property.

<div align="center">56.</div>

The need for privacy remained.  In or about August, 2014, some temporary screening material to provide some needed privacy and additional security was added to the fence. Specifically, Mr. Lippert caused a temporary dark wind screen to be erected onto the fence to materially block the view from Highway 46 to the Lippert property.  No approval was sought for the temporary barrier or screening fibrous material as it was not a structure or improvement.

<div align="center">57.</div>

Further, not only was it not necessary to obtain a submission and written approval of only a temporary screen tied onto and temporarily installed on the fence, the Lipperts were required to comply with the Restrictions to screen certain features in their backyard.  The Declaration specifies at Article III, Section 27 that a lot owner such as the Lipperts "... shall construct and maintain an inner fence or other improvements to *screen from view* of the streets and common area the drying of clothes, yard equipment, storage piles which are incident to the normal residential requirements of a typical family."  (Emphasis added.)  In addition to Plaintiffs' concerns addressing safety and lack of privacy, the Lipperts desired to be compliant with this provision.  Storage piles, lawn equipment, and drying of clothes (including towels from usage in connection with the pool on a clothes line that predated the erection of the no-climb fence) were located in the Lipperts back yard.  The Lipperts were therefore *required* to screen.  Given that a privacy fence was wrongfully denied, and until the back trees could mature enough for sufficient screening, the Lipperts laced a removable professional-grade dark green screening material onto

the approved no-climb fence.  This act met the Lippert's obligations under the Declaration to screen from view those items required to be screened from view.

<div align="center">58.</div>

The Lipperts received no complaint as to the approved fence - until they placed the temporary dark-green-colored professional windscreen material onto the fence to assist in providing some measure of privacy and screening from view certain items in the back yard which the Restrictions required to be screened.  No call.  No letter.  No violation notice from the management company.  Rather than the usual protocol to address a potential restrictions violation, the Lipperts received a threat from Association's counsel.

<div align="center">59.</div>

On or about August 26, 2014, the Defendant Association, by and through its agent Tom L. Newton, Jr., attorney with the law firm Allen, Stein & Durbin, P.C., sent a letter to the Plaintiffs stating therein that "According to the records of Association, you are in default under Article VI of the Declaration.   Article VI, Section 2 requires prior approval from the Architectural Control Committee before erection, placement, or alteration of any fence."

<div align="center">60.</div>

On or about October 22, 2014, the Defendant, by and through its agent L.C. ("Tina") Jameson, "Community Manager" with C.I.A. Services, Inc., dropped off a letter to the Lipperts referencing the August 26, 2014 letter, stating The Board of Directors of the Association had discussed the appearance of the Lipperts' rear "black plastic fence" and that it had voted unanimously that it be removed no later than Sunday, October 26.  The Lipperts had not erected a black plastic fence.  The underlying structure of the King Ranch style mesh no-climb fence was undisturbed and not modified.  Only a temporary screening had been tied thereon.  It further

stated in the letter that if not removed by that date, "the matter will be turned over to the Association's attorney for further legal action." No specific reasons for the Board's decision were provided. This letter was "sent" to Plaintiffs Doug and Jane Lipperts, not by certified mail, or even through the U.S. Postal Service. It was stuffed in the Lipperts' front door seal of their residence.

<div align="center">61.</div>

The Lipperts seek declaratory relief that they have a right to put up an 8-foot wood privacy fence near the rear of their home. To the extent, if any, ACC approval is required to put up a temporary screening material on an approved fence, the denial of such screening was arbitrary, capricious or discriminatory for which the Lipperts seek declaratory relief and recovery of attorneys' fees under Chapter 37 and/or 38 of the Texas Civil Practices and Remedies Code, and the Declaration itself.

<div align="center">62.</div>

In approximately July 2013, after others had planted Crepe Myrtle trees without ACC approval, and seeing Crepe Myrtle trees on display on other properties in the front yard and near the entrance of the Subdivision near their home, the Lipperts planted starter Crepe Myrtles. An ACC member urged that submission nevertheless be made to the ACC even after their planting. The Lipperts sought approval to plant the Crepe Myrtle trees in their front yard, and submitted the appropriate forms and information to the ACC. Surprisingly, the ACC denied the request without providing any explanation whatsoever. When Plaintiff Lipperts sought clarification, since various property owners in the subdivision have Crepe Myrtle trees planted in their front yards, Lee Allman, the ACC Chairman at that time, claimed that the Declarations required that the Comal Trace subdivision be an "open concept community" and that was why the trees in the

front yard were denied.  Plaintiffs dispute this explanation, since many homes in the subdivision are obscured from view by foliage and trees, including those of various ACC and/or members of the Board of Directors.  The Declaration does not prohibit the planting of plants or trees in one's front yard.  There is no "open concept requirement" preventing the planting of crepe myrtles in one's front or back yard.  The denial was never reversed.  The denial was arbitrary, capricious or discriminatory for which Plaintiff Lipperts seek declaratory relief and recovery of attorney's fees under Chapter 37 and/or 38 of the Texas Civil Practices and Remedies Code, and the Declaration itself.

63.

Plaintiff Lipperts incorporate herein the allegations above regarding the January 27, 2015 meeting.  The Lipperts had arrived at the meeting approximately 30 minutes early and Chris Eldridge intentionally waited until after most residents were there before publicly asking the Lipperts in the Hall to remove them.   Once outside, Defendant Eldridge informed Plaintiff Lipperts that they were being prohibited from attending the Board meeting pursuant to a provision in the Bylaws which disallows owners in active litigation with the Association from participating in Association involvement if there is a dispute about interpretation of the restrictions.  Thereafter, while Plaintiffs Lippert were left outside, dumbfounded and in shock and suffering extreme mental anguish, humiliation, and embarrassment as designed by Defendant.  Chris Eldridge went back inside the place where the Board meeting was being held at which he publicly announced that he had just barred Doug and Jane Lippert from attending the Board meeting pursuant to a provision in the Bylaws.   There was no legitimate purpose in announcing to the meeting that the Lipperts were excluded other than to publicly shame and further embarrass the Lipperts.

64.

In addition to seeking the relief with CTHOAG as to declaratory and injunctive relief, Plaintiffs also seek monetary damages as a result of Defendant' negligence and negligence per se in connection with the violation of the Open Meeting and other provisions of the Texas Property Code preventing exclusion based on a Board's classification whether a home owner was in good standing., including the mental anguish and humiliation associated with being called out and subjected to a public shaming and exclusion as Defendant undertook. Defendant has also denied Plaintiffs Lipperts to common areas owned or maintained by Defendant.

65.

The Association wrongfully billed attorney's fees to the Lipperts on their personal account.

66.

Plaintiffs Lippert believe that the Defendant Association is improperly interfering with their property rights; and alternatively, that the Defendant Association wrongfully withheld ACC approval of their request for a privacy fence, denial of a temporary screening on their otherwise approved fence, and Crepe Myrtle trees in their front yard. Alternatively, the Lipperts assert waiver and acquiescence as privacy fencing has been allowed elsewhere in the Subdivision.

67.

Because the Defendant Association wholly failed to provide any pertinent reasons for the denial of the request for the privacy fence or subsequent screening on the approved fence, the Plaintiffs believe that the denial is wrongful. The Association's enforcement actions were designed to punish the Lipperts for not obtaining written approval from the ACC prior to placement of the screening when no permission is required because obtaining screening is

mandatory under those circumstances.   Defendant erroneously call the approved fence as temporarily screened a "plastic fence" or fence with "black trash bags" tied to the fence.

*Joseph W. Campbell and Anita H. Campbell*

68.

Plaintiffs Joseph ("Joe") Campbell and his wife Anita Campbell (hereinafter sometimes collectively referred to herein as "Campbells") are the owners of a residence located at 210 Crescent Lane, Bulverde, Texas, 78163 and legally described as Comal Trace 2, Lot 51, 1.21 acres in the Real Property Records of Comal County, Texas (hereinafter within this Section as the "Property" or the Campbell's' Property).

69.

The Campbells bought their Property on or about December 2007.   The Campbells' Property is governed by the same Declaration referenced above.    The Campbells put in their major improvements and retaining wall and driveway in approximately 2008 and 2009, all with ACC approval.

70.

The Campbells purchased a 5th wheel or trailer, which could be called a recreational vehicle ("RV").   The RV is not built of mortar or by contractors as a permanent structure or dwelling.   The Campbells do not use their RV as a residence or dwelling.   Neither is it a structure.   It is more akin to a trailer or vehicle.

71.

Despite erroneous representations by some elements of Defendant Association, RVs are not prohibited from being located on members' properties.   It need only be enclosed or screened so as to "substantially limit" the view from streets or adjacent lots.   Section 25 under Art III

(Construction Requirements).  "Behind set back lines" is not defined and does not reference whether it refers to structural or utility lines or from what perspective (from street view, from standing in the middle of the Lot?) "behind" should be applied.  As such, it is ambiguous.

72.

Before the Campbells bought their property, they reviewed the deed restrictions and title search to make sure RV's were allowed before purchasing their home.  Before they brought their RV onto their property, they canvassed the neighborhood.  They saw other boats, RVs, trailers, and other vehicles were allowed to be parked or kept out in the open, and certainly not limited to being parked or kept within a 40 foot side setback or 75 foot structural setback as if such vehicles were structures.  Indeed, as could be discerned from a casual drive in the neighborhood, the setback lines referenced in Section 25 references the utility setback lines on one's plat, not the front and side structural setback lines as if a car or RV was a structure.  The Campbells' utility setback lines are 10 feet on the side and rear as previously submitted to the Association.  Or alternatively, even if one engaged in a fiction or presumption that the setback lines referenced structure setback lines, the only common sense way to apply the above provision would be that such language references only that RVs and other vehicles could not be parked forward of the front structure (to wit; they must be kept or parked "behind" the front setback line of 75 feet from the perspective of looking from the street).  Otherwise, not just a few but many lots in the Subdivision would be in abject violation of the Declaration for which most of the ACC members and members of the Board of Directors would be in repeated violation.

73.

Under Texas jurisprudence, such ambiguities must be resolved in favor of the freer and less-restricted use of land.  Plaintiff Campbells seek declaratory relief that the setback lines

references can only reasonably refer to utility setback lines as there is no distinction in the Declaration or, alternatively, that "behind" means only the front setback line from the perspective of looking at the lot from the street in front of the Lot.

74.

In the summer of 2013, the Campbells brought their RV onto their property. The Campbells placed their RV on the crushed granite driveway behind the gate of the fence and well "behind" the front-facing structure of the house, and well "behind" the 75 foot frontal structural setback on their property from the street if one should believe that RVs and vehicles should be treated as structure. Moreover, as originally located, the Campbells' RV was not infringing even on the side utility setback. The location of the RV was already screened as located. The extent of the screening where the RV was initially kept was much more screened from the public streets and adjacent lots than other boats and RVs regularly seen in the Subdivision. The ACC had even expressly approved other screening that the Campbells had sought to also simulate with an approval but Defendant purported to deny such plans. The Campbells property is near the end of a street that dead-ends in a cul-de-sac. The RV as kept on and off the property in late 2013 through early 2015, was substantially screened from view from the street by the Campbell's' own home and by trees and vegetation. Further, it was already substantially screened from the Campbells' neighbors by thick vegetation. Although not needed, even the neighbor closest to the Campbell's Property where the RV was stored had expressly consented to the location of the RV as stored and kept on the Campbell's property

75.

No immediately adjoining neighbor of the Campbells has complained to the Campbells - ever - regarding their keeping the RV or the location of their parking the RV on their property.

76.

The RV was already in compliance with the Declaration in January 2014. However, by letter dated January 14, 2014, the Campbells received a notice of violation from the Association with the directive: "PLEASE STORE CAMPER OUT OF PUBLIC VIEW." There was no complaint by the Association or any representative on its behalf as to the location of the RV when it was parked on the crushed granite driveway behind the gate of the fence, merely that it was not properly screened. There was no complaint by the Association or any representative on its behalf that the height of the RV was barred or prohibited or that the height had to be a certain height relative to the roof of their home. Indeed, there is no vehicle height restriction in the Declaration as to how small or how high a vehicle must be. Even if one pretended there was such a height limit, the Campbells' RV was not higher than the roof line.

77.

Plaintiff Campbells seek declaratory relief from Defendant Association that, as maintained on their property in January 2014, Plaintiffs Joe and Anita Campbell were compliant with and not in violation of the Declaration as it related to the keeping of their RV in a manner that was substantially screened from public view. This is a justiciable controversy as Defendant has asserted otherwise in contravention of the facts, the Declaration, and the law. Indeed, in early 2014, there were erroneous assertions and protestations by Defendant that RVs and boats were not even allowed or permitted in the Subdivision, or that a property owner had to first secure permission from the ACC to even have an RV or boat on one's property.

78.

Although believing their RV to be compliant with the Declaration, to avoid controversy and to try avoid any confrontation with the Association, and recognizing that there was a sliver

of a sight line, if one was walking on the street and stopped, where one might see part of the RV as parked, the Campbells submitted an application to the Association to put up additional screening. The Campbells sought to promptly obtain the permission for the additional screening to render moot the notice it received in January 2014. The Campbells submitted their application or submission for additional screening to the Association in February 2014. The submission was to address the only compliant made in connection with the RV – further "screening from public view."

79.

The Association's management company at that time required that the submission be personally delivered or mailed rather than e-mailed. The Campbells inquired of Chris Eldridge what kind of screening would be acceptable; he urged a camouflage screening. The Campbells, not committed to camouflage screening material, inquired of the Association management company if there was any other kind of screening material preferred by the Association (or its ACC). There was no response by the Association or its ACC or other agents as to what kind of screening was preferred. After obtaining and filling out the Association's Improvement Request Form (IRF), on or about February 22-26, 2014, Anita Campbell personally delivered the Improvement Request Form (IRF) to the Association and ACC's agent for receipt of such paperwork, MP of Texas on Tezel Road in San Antonio. The Association did not assert the submission was incomplete.

80.

The submission in February 2014 proposed adding a camouflage screening would have added to the existing gate. The proposed screening would extend the existing gate upward and would screen upward and screen in a manner that tapered sideways from the gates on both sides

of the existing fence.  Photos of the camouflage screen that could be promptly ordered, and a gate design plat, was part of the materials presented with the IRF.  Essentially, it was an add-on feature to an existing, approved element of their Property.  The management company sent an email to the Campbell's confirming they had received the information and would forward it and get back with them.

<center>81.</center>

After submitting the IRF with supporting documentation, there was no further communication to the Campbells regarding their RV for weeks.  For months.  No call.  No written response.  Nothing.  Meanwhile, the Campbells continued to keep their RV on the crushed granite driveway behind the gate of the fence, the same location it was located when they received the notice alleging a violation in January 2014.  The Campbells seeks declaratory relief that such submission, to the extent one is required, was deemed approved based on the failure of the Association or its ACC or any other agent on behalf of the Association to respond.

<center>82.</center>

Plaintiff Joe Campbell spends a significant amount of time out of the country for his work, and Mrs. Campbell had been undergoing cancer therapy in 2014.  Defendant knew this.  Mr. Campbell arrived back at home the last part of October and remained home from that time until January 6, 2015 while his wife was undergoing cancer treatment.

<center>83.</center>

In November 2014, approximately 9 months after the submission by the Campbells for the additional screening to augment the house and vegetative screening that already existed, without a phone call or express response in reply to the submission, the Campbells received a new notice of violation by a different management company for the Association, CIA Services.

It was the same complaint: that the RV was "stored in public view." The complaint urged it be removed and relocated per guidelines. The Campbells had not been apprised of any "guidelines" as referenced and they again did not believe they were in violation. But they knew it was not in public view. Joe Campbell contacted the Association, through its property management company, and explained that the RV was not in "public view", as it was in virtually in their backyard and surrounded by trees and shrubs on 3 sides and their own house on another.

84.

The Association and CIA Services indicated they could not locate the prior February 2014 submission to the Association. The Campbells resubmitted the package again in November 2014, and the Association's management company confirmed in writing they had received it.

85.

In December 2014, the Association's ACC had STILL not approved the screening and the Campbells received a new notice in December 2014 urging again to remove from "public view." Although it was not in "public view," the Campbells desired to render moot such concerns by simply adding the additional camouflage screening but they had not yet been appraised if the ACC wanted camouflage or other screening as the Campbells had also urged a willingness to use lattice as apparently permitted by another RV owner down the street.

86.

This notice in December indicated that the alleged violation be remedied by January 3, 2015, but Joe Campbell called and obtained an extension to March 1, 2015, given the holidays and how long it was taking the Association to expressly approve (rather than just deem approved) the particular camouflage screening (as it would take some time to order the

camouflage screening) and his being out of the country beginning approximately January 6, 2015.

<div align="center">87.</div>

On December 17, 2014, Mr. Campbell received an e-mail from Richard Sommer, a member of the Board of Directors and the Chair of its ACC. He asked for a plat although the location of the RV was not an issue as presented to him – only the lack of screening from "public view" in 3 notices up to that time had been the issue. Mr. Campbell provided a plat of the gate area where the screening would be located, and included other helpful photos and other information. Indeed, Plaintiff Joe Campbell wanted to wrap this up before he left the country on January 6, 2015. This was followed up with a phone conversation, wherein Plaintiff Joe Campbell was also informed by Mr. Sommer for the Association that the ACC would not be meeting until January and that there were some in the Association and members on the ACC who simply did not want RV's or trailers in the subdivision. In both phone calls Mr. Campbell had with Mr. Sommer, Mr. Sommer told Mr. Campbell that there were members of the board that did not want RV and trailers in the subdivision.

<div align="center">88.</div>

On January 5, 2015, on the eve of Mr. Campbell leaving the country for work, Richard Sommer of the Defendant Association's ACC sent Mr. Campbell an e-mail indicating that another ACC member was inquiring about the existing gravel driveway leading to the storage location for the RV, which is really the gravel driveway leading to the gate accessing the backyard. Mr. Campbell informed that the driveway was originally present when the property was purchased, but was only limestone, and that the crushed granite driveway replacing this original feature had been approved by the ACC in 2008. On or about that same time, that same

day, Plaintiff Joe Campbell submitted the plat and the approval letter from a prior ACC to Mr. Sommer to substantiate his statements.

89.

Also on January 5, 2015, Mr. Campbell indicated that if the ACC preferred he would be willing to use a lattice screening much like the screening that ostensibly was allowed with another RV owner for which Mr. Campbell included photos. Defendant Association's ACC did not respond with any preference.

90.

Although the screening proposal from 11 months prior was still pending for which the Campbells had not yet received an express response, the Association via CIA issued a letter dated January 8, 2015 to the Campbells (but sent after such date and after Mr. Campbell had left the country). The notice received on or about January 15, 2015, again alleged the same complaint against the Campbells. The Board was aware that Mr. Campbell was leaving the country January 6th. The notice alleged "on our most recent inspection on 01/05/2015, we found the following problem on your property and would appreciate your cooperation in correcting it as soon as possible. Problem: Travel trailer stored in public view - please screen and store out of view."

91.

Again, as with prior notices, the only complaint in the notice dated January 8, 2015, notice was an alleged lack of screening. There was no complaint of its location – just that it was not sufficiently screened. However, surprisingly, in this notice, received by the Campbells on or about January 15, 2015, the Campbells were only given until January 15, 2015 to correct the "problem" or to contact the Association's representative regarding same. This was surprising

because the Campbells had already been given until March 1, 2015, to resolve this issue and of course was hopeful the ACC would approve the screening well before March 1, 2015.  Anita Campbell contacted the Association's property management company on January 15, 2015, and although she asked for Tina Jameson, Mrs. Campbell was informed Ms. Jameson was unavailable.  However, Mrs. Campbell was told that their Home Improvement Request was not approved.  Mrs. Campbell then contacted Mr. Campbell in Peru and informed him of the reported denial (the basis for the denial, a wholly completely different ground than was the basis of the notices of alleged violation, was not related to the Campbells and they would not receive that until later in January 2015).

<div align="center">92.</div>

Even if one pretended Mrs. Campbell had never personally delivered the submission in the first place, and that the submission was not even made until December 9, 2014, the submission was still deemed approved for failure to expressly deny within 30 days.  Again, declaratory relief is sought that the submission of February 2014 as augmented thereafter (November or on or about December 5, 2015), was deemed approved before any notification of denial to Plaintiffs.

<div align="center">93.</div>

After being notified of a denial by his wife while he was in Peru, on or about January 15, 2015, Plaintiff Joe Campbell contacted the Association, inquiring about the status of his Home Improvement Request, expressing dismay that it was denied, and also explaining that the January 15 deadline was already on them and he was under the understanding that he had until March 1, 2015, not that very day, to try to resolve the Association's allegation of notice.  He was not available to move the RV at that time, and inquiring whether it would be acceptable to maintain

the RV in this location until no later than March 1, 2015 as the Association had previously agreed. Ms. Brack, with the Association's property management company, provided him a verbal assurance that it would be all right, that the Association should stick to its original deadline rather than moving it up, and that she would also confirm again the March 1, 2015 extension at the Board meeting to be held on January 27, 2015.

94.

In the denial letter dated January 15, 2015 (but post-marked after said date), the Association, through CIA as its property management company, notified the Campbells that their request of 11 months prior for a screen over their gate had been reviewed by the ACC and denied. The basis for the denial was completely different and new. The basis of the denial was because the "vehicle (RV) being stored is not located within setbacks (Article III, Section 25)." What?! Setback lines for screening? In three prior notices spanning a year, there had not been a peep out of the Association about an alleged violation of the RV's location as being violative of setback lines – only that the RV was not sufficiently screened where it was located. Neither MP of Texas or C.I.A. or the ACC or the Association had asserted in over a year to the Campbells ANYTHING having to do with the location of the RV – just that it needed to more effectively screened from public view.

95.

Defendant Association's denial of the camouflage screening of the gate where the RV was located for well over a year is untimely, and/or legally erroneous and ineffective. If the February 2014 submission is not approved by deemed approval, its denial should be void as being arbitrary, capricious, or discriminatory in violation of the Property Code. Alternatively, Defendant Association should be estopped from belatedly asserting setback line violation as a

basis for denial when all 3 notices and Plaintiffs' submission and supplementation of information was designed to address the Associations stated concern regarding sufficiency of screening – not setbacks. As such, the Campbells also assert laches and acquiescence to the location of the RV as it had been present for most of the time from the summer of 2013 to early January 2015. Alternatively, the Campbells assert waiver as other vehicles were located on dozens of properties within structural setback lines every day.

<div align="center">96.</div>

The Campbells had thought their long journey to gain express approval of the screening for the RV after almost a year would be over. However, it was just beginning. The Association's newfound position that the screening should be denied based on setback lines as if the RV is a structure was erroneous. Although the Campbells could have filed suit at that time, they did not. In another attempt to simply get along, and to try to avoid litigation, the Campbells sought yet again to gain the express approval of the ACC to avoid a legal dispute with the Association.

<div align="center">97.</div>

On or about January 25, 2015, the Campbells submitted a different and new Home Improvement Request for screening for their RV that involved a relocation of where the RV was kept on the Campbells Property. Additionally, because lattice work screening had obviously been accepted based on another RV owner's lattice partial screening of his RV, the Campbells submitted a lattice screening proposal given the declining of the prior submission that would have included complete camouflage screening. In effect, even though the Campbells had the right under the law to keep the RV where it was being stored, the Campbells sought to accommodate the location objections of the Association's ACC.

98.

Along with the new IRF form, he submitted photos, color samples, swatches, drawings and a plat showing a new location of the RV that would meet all setback lines even if one engaged in the fiction that a vehicle could not be parked within 75 feet of the front and back of the property line or 40 feet from the side.

99.

Mr. Campbell also submitted a letter in support of their new request. Mr. Campbell's letter accompanying the new submission further noted that the lattice screening for which he was seeking approval had already ostensibly been approved and was in use for another owner in the community to screen their RV. Mr. Campbell even contacted the same contractor as was used by the other RV owner to construct the screen because he was seeking desperately to get approval and what better way to get approval than to copy the design of another RV owner's screening that existed in the community that was in use with approval or at least without apparent dispute from the ACC

100.

On January 28, 2015, the Association's President, Chris Eldridge, called Mrs. Campbell, knowing that Mr. Campbell was in Peru, and sought to come over to their home to visit in person. Eldridge was aware that Mr. Campbell had left the country on January 6, 2015, and would be gone until at least the first week in February. During their telephone conversation, Mrs. Campbell informed Eldridge that given her cancer treatment she was not feeling well or presentable to receive company. Chris Eldridge nonetheless came over to the Campbell's residence and personally trespassed. Mrs. Campbell felt pressured to allow him inside their home. Eldridge then asked Mrs. Campbell if she and Mr. Campbell had had obtained permission

to build the crushed granite driveway that extends to their back gate, which accesses the Campbells' backyard. As previously stated, this had been approved by the Association's ACC years prior. Mrs. Campbell showed Chris Eldridge the plat that had been approved in 2008 by the ACC. Of course, the Campbells had already submitted this same documentation to Richard Sommer of the ACC on January 5, 2015. Ms. Campbell, already very worried about the denial of the RV and the Association's attempt to reduce the cure period so that she would have to deal with it and move it while her husband was out of the country,  was very anxious why the Association's President would now be trying to raise new issues.

<p style="text-align:center">101.</p>

On February 3, 2015, Tina Jameson, with the Association's property management company, called Mr. Campbell in Peru to inform him that the Board of Directors wanted to meet with him regarding the screening for his RV. Mr. Campbell informed Ms. Jameson that he was unavailable until February 11, 2015, but that he would certainly be willing to meet with the Board of Directors. Mr. Campbell asked for written confirmation as to when, where, and at what time the meeting was to be held.  The Association's representative was later told he was also unavailable February 12 and 13, 2015.

<p style="text-align:center">102.</p>

After not receiving a confirmation of a meeting from the property management company, Mr. Campbell sent an e-mail to Ms. Brack, with the property management company, on February 8, 2015, inquiring about when, where, and what time the meeting was to be held, and again provided the dates that he would not be available to meet.

103.

On February 12, 2015, Chris Eldridge phoned the Campbell's residential landline and left a voice message indicating he wanted a few men to go over to their home at 4:00 p.m. that afternoon. Then, on February 13, 2015, Tina Jameson, with the property management company, called and informed that the ACC wanted to come by their residence. Both of these days are days that Mr. Campbell had previously informed them that he would not be available.

104.

Shockingly, in email correspondence on or about February 10, 2015 and by formal correspondence dated February 18, 2015, Plaintiff Campbells were notified their application for lattice screening had been denied. Not because of the screening. Not because of the location. The ACC came up with a completely new basis that had never before been the basis of any complaint or notice to them. The denial was because the "submitted design (for the storage of an RV so prominent and the elevation so high relative to the main home) would not create an attractive and harmonious blend with existing and proposed dwellings in the immediate area and the natural surroundings (DCCR: Article VI, Section 6)."

105.

There is no vehicle height requirement, either minimum or maximum. There is no requirement in the Declaration that one's vehicle parked or stored on one's property must be of a certain seal level or height relative to a roof line or other point of reference. The Association's conduct through its ACC, in denying the submittal, was arbitrary, capricious, and discriminatory. Article VI, Section 6, the basis for the denial, is based on dwellings. The RV is not a structure. Nor is it a dwelling. Mr. Sommer's prior statement proved to be prophetic and pathetic: they just did not want the RV in the subdivision.

106.

Unbeknownst to the Campbells at the time, the Defendant ACC simply loosely based its denial not on any real belief that the proposal was violative of any particular term of the Declaration, but based on a subjective collection of feelings based on the "looks" of the proposal. To underscore the arbitrariness of the decision, Chairman Richard Sommer, as if "king" of the ACC rather than its Chairman, unilaterally nixed any reasonable deliberation or debate of such issues by asserting to the ACC that the Campbells plan would not pass simply because he was against it.

107.

Plaintiffs Anita and Joe Campbell believe their RV as previously kept on their property is not in violation as it was already substantially screened from view by the house and vegetation from the other side of the house. Plaintiff Joe and Anita Campbell urge declaratory relief that the placement of their RV before it was moved per the instructions and demands of Defendant was not in violation. Indeed, to underscore how arbitrary, capricious, or discriminatory it is to deny Plaintiff Campbells their RV even without additional screening, all one needs to do is look at prior Chair Lee Allman's keeping of his RV on his property, which, comparatively speaking, is more visible than the Campbells. The Wolfe's RV, too, is comparatively speaking, less screened with lattice than the Campbells' RV even before the Campbells sought to add additional screening by camouflage or lattice. In the unlikely event the Campbells are not entitled to maintain their RV as originally maintained because screening from public view was already substantial, or in the further unlikely event the first submission is not complaint with the Restrictions, the ACC's denial of the second submission is void as it was clearly arbitrary, capricious, and discriminatory. Based on information and belief, ACC Chair Richard Sommer

torpedoed the submission himself, with support and knowledge of the Board simply because he subjectively did not like the "looks" – not because it violated the Restrictions.

108.

Richard Sommer made it clear to the Committee that if he was against it, approval would not be an option for the Committee. Plaintiff Campbells seek declaratory relief that the denial of the second submission is void as being arbitrary, capricious, or discriminatory. Further, or in the alternative, Plaintiff Campbells seek declaratory relief that the Defendant Association is estopped from asserting vehicle heights or other grounds NOT made the basis of any complaints for over a year that the RV was being stored at the Campbells' home.

109.

The Campbells contend that the Defendant Association's actions are wrongful because the Defendant Association is not authorized to use its powers, of approval or otherwise, to punish property owners under the auspices of such actions being goals and functions of the Association, its ACC, or other agents/representatives, described in the Declaration, and as such Defendant Association has exceeded its authority thereunder by taking such actions.

110.

Such actions on the part of the Association and its agents necessitated the joining of the Campbells to this lawsuit - initiated by the Lipperts - for similar conduct. Plaintiff Campbells also assert the Association should be estopped from belatedly complaining of location or height of the vehicle, in addition to laches and acquiescence.

111.

The Campbells assert all attorneys' fees and costs as is just and reasonable against Defendant Association under Chapter 37 of the Texas Civil Practices and Remedies Code, in

support of all the declaratory propositions set forth in this lawsuit brought by the Campbells. The Campbells also seek attorneys' fees for breach of contract (the Declaration) under Chapter 38 of the Texas Civil Remedies Code as Defendant Association has breached the Declaration's terms against use restrictions not amended and made a part of the Declaration, among other things, including storage fees and additional expenses of having to store and travel to the RV after it was moved off site to avoid the Association suing the Campbells in the same manner that the Association is suing the Lipperts.

<div align="center">112.</div>

The Campbells also assert deemed admission and estoppel. Additionally, the Campbells also alternatively urge waiver. Moreover, to the extent there are ambiguities, such as whether a setback" is applicable to an RV is a structural or utility/easement setback, or whether "behind" only means the front set back, Plaintiffs Joe and Anita Campbell assert any ambiguity should be resolved in favor of the least restrictive use of the land.

<div align="center">*Ronald Norman McKinnon*</div>

<div align="center">113.</div>

Plaintiff RONALD NORMAN McKINNON, (hereinafter sometimes referred to as "Plaintiff McKinnon") is the owner of real property within the Defendant Association's Subdivision regime located at 170 Alvin's Way, Bulverde, TX 78163 and legally described as Comal Trace 4, Lot 137, Acres 1.26 in the Real Property Records of Comal County, Texas. As such, said property is subject to the same Declaration as property owners in Unit 1 and 2.

<div align="center">114.</div>

On June 2, 2014, Mr. McKinnon submitted a Home Improvement Request Form to Kaitlin Morales with MP of Texas, the Defendant Association's property management company

at that time, for a fourteen (14) foot variance on the left side of the driveway on his property for the placement of a small mini-garage/storage facility.  It was designed to be in conformity with the requirements, as to appearance and exterior colors and materials, of his home and otherwise compliant with the Association's restrictive covenants.  The variance request was made prior to any construction of the structure.  It would not invade the front property line and would enjoy the consent of the neighbor on whose side the small variance was needed for a side setback.  As such, it would be similar in placement but not as invasive of the side setback as many other storage sheds/garages on properties located within the Subdivision.

<div align="center">115.</div>

Many other structures were within side structural setbacks or did not even have any authorization showing any submission at all.  Current and past Board and ACC members enjoy the benefits of side, rear, and back variances from setback limits, either expressly provided or acquiesced to by the Association and the community.  Other improvements had been authorized on little more than rough hand-written drawings.  As was noted by a factor in other continuances granted, Mac enjoyed the consent of his neighbor.  Plaintiff McKinnon was confident that, consistent with the approvals and setback tolerances allowed in the past, his submission would be promptly approved.  Shockingly, it was instead denied.  After submitting the Home Improvement Request Form and all requested supporting documentation, Plaintiff Ronald (Mac) McKinnon received notification of the denial of the variance request by the Association's agents on or about June 18, 2014.  He also received an invitation to resubmit his request with additional information such as a copy of the land title survey with the improvement drawn to scale as well as a detailed description of the shed to be built, including but not limited to the dimensions, height, width and length, of the shed, color samples and roofing material.

116.

Then on or around June 19, 2014, Mr. McKinnon contacted the Association, via e-mail communication, requesting that the ACC committee members visit his property to assist in locating a suitable location for the mini-garage.  No constructive response to this communication was received from the ACC committee to this request.

117.

On June 23, 2015, Mr. McKinnon once again contacted the ACC committee reiterating what his intentions were as to the construction of the storage shed and the variance request as to the mini-garage's location.

118.

On July 3, 2014, Mr. McKinnon received notification from the Association that his variance request had been denied.

119.

On July 21, 2014, based upon the instructions of a member of the ACC committee, Plaintiff McKinnon forwarded an e-mail to the members of the ACC committee providing further clarification as to the structure, its intend purpose, and further description indicating the structure's appearance would be in conformity with the primary residence on the subject property.  There was no response from the ACC committee to this e-mail correspondence from Mr. McKinnon.

120.

On August 1, 2014, once again pursuant to an instruction from a member of the ACC committee and after receiving no response to the July 21, 2014 e-mail communication, Plaintiff

McKinnon forwarded an additional e-mail communication to the members of the ACC committee requesting a meeting at Mr. McKinnon's residence to review his variance request.

<div align="center">121.</div>

On August 12, 2014, Plaintiff McKinnon followed up his August 1, 2014 e-mail communication with the ACC committee with a phone call to a member of the ACC committee requesting a response to his August 1, 2014 e-mail communication to the ACC committee.

<div align="center">122.</div>

Then, once again, on the instructions of a member of the ACC committee, on August 16, 2014, Mr. McKinnon forwarded another e-mail communication to the members of the ACC committee again requesting an on-site visit to discuss his variance request. As before, there was no response from the ACC committee in regards to this communication and Mr. McKinnon's request. Additional attempts to communicate with the ACC committee were attempted via e-mail on August 19, 2014 and August 24, 2014.

<div align="center">123.</div>

On August 26, 2014, Mr. McKinnon received an e-mail communication from a member of the ACC committee notifying him that there would be no ACC meeting to review his request.

<div align="center">124.</div>

On August 27, 2014, Mr. McKinnon forwarded a detailed communication to the ACC committee reviewing his attempts to amiably resolve the issue regarding his construction of the mini-garage structure and once again requesting a meeting with the ACC in another attempt to work with the Association on his variance request. Mr. McKinnon received no response to this communication.

125.

On September 10, 2014, Mr. McKinnon forwarded an e-mail communication to the Association's board president regarding his attempts to communicate with the ACC in this matter and requesting a meeting with the board of directors in order to have his matter heard.

126.

On September 14, 2014, Mr. McKinnon met with the ACC to discuss variances on other properties. The ACC was advised that the owners of the properties adjoining Mr. McKinnon's were in support of his construction of the mini-garage. On this date, the Association's board president advised Mr. McKinnon via e-mail communication that his request for a meeting with the board of directors was not being granted at this time.

127.

On September 15, 2014, the Associations' board president requested that Mr. McKinnon postpone his hearing with the board of directors to discuss his mini-garage construction until after the Association's annual meeting when a new board would be in place. Mr. McKinnon agreed to this request.

128.

On September 17, 2014, Mr. McKinnon requested an official reason for the denial of his variance request to construct the proposed mini-garage. Mr. McKinnon was informed by a member of the ACC that the denial was based on location and placement. The variance was denied even though there are numerous properties located within the Comal Trace subdivision with structures located within the setback areas of the properties.

129.

On September 22, 2014, Mr. McKinnon once again attempted to arrange a meeting with the Board on his property to discuss his variance request. The Board refused to meet with Mr. McKinnon at his home. They said they would meet at a pizza parlor in Bulverde, Texas. When Mr. McKinnon declined to have a hearing at a pizza parlor, the meeting was ultimately scheduled to proceed immediately before a Board of Directors meeting on or about October 20, 2014.

130.

Plaintiff McKinnon is a retired veteran of the United States Army who suffers from post-traumatic stress (PTSD) and stomach and intestinal problems. As a result of the Association's failure to act in a reasonable manner to Plaintiff McKinnon's repeated attempts to address the arbitrary, capricious and discriminatory manner in which his requests before the Defendant's ACC were treated Plaintiff McKinnon's health has been adversely affected.

131.

Plaintiff McKinnon contends that the Defendant Association's actions are wrongful because the Defendant Association is not authorized to use its powers, of approval or otherwise, in an arbitrary, capricious or discriminatory manner under the auspices of such actions being goals and functions of the Association, its ACC, or other agents/representatives, described in the Declaration, and as such Defendant Association has exceeded its authority thereunder by taking such arbitrary, capricious and discriminatory actions.

132.

The Committee's exercise of discretion in denying the minor variance was arbitrary, capricious, and void. Alternatively, Defendant Association should be estopped or is barred by waiver from asserting the side setback restriction under these circumstances. In addition, it is Plaintiff McKinnon's contention that the ACC's committee's decisions in enforcement of the Association's restrictive covenants as to Mr. McKinnon were arbitrary, capricious, and discriminatory.

133.

Plaintiff McKinnon alleges that Defendant Association has waived its rights to enforce the side set-back restriction if Plaintiff has consent of his neighbor most affected when the submission was made. Numerous other violations exist for which the Association does not even have record of submission or variance. Alternatively, Plaintiff McKinnon alleges that the denial of his requested mini-structure is arbitrarily, capricious, or discriminatory.

## IMMINENT HARM; PROBABLE RIGHT TO RELIEF; PREDICATES FOR INJUNCTIVE RELIEF

134.

If Defendant Association is not restrained and enjoined from denying Plaintiffs' (as property owners) the full and complete enjoyment of their property rights, Plaintiffs as well as others residing within the Comal Trace subdivision will be damaged and denied full enjoyment of their property rights without any restraint or accountability to said property owners.

135.

Plaintiffs believe that the Defendant Association, by and through its ACC, intends to continue denying Plaintiffs approval requests for improvements, including (but perhaps not

limited to) fencing and the installation of Crepe Myrtle trees on the Lippert property, the RV screening on the Campbell property and the construction of a mini-garage/storage facility on Mr. McKinnon's property.  Plaintiffs seek an Order of the Court forbidding Defendant Association from interfering with Plaintiffs' property rights in this manner.

<div align="center">136.</div>

Furthermore, if Defendant Association is not restrained and enjoined from denying the Plaintiffs Lippert their right under Texas law to attend Board of Directors' meetings and Association meetings, and publicizing such decisions to the other owners and residents of the subdivision, Plaintiffs Lippert will be further damaged.

<div align="center">137.</div>

Although affecting real property rights, if necessary, Plaintiffs also aver they have no adequate remedy at law for the injunctive relief sought above.

<div align="center">138.</div>

Specifically, Plaintiffs aver that at all times relevant hereto, Defendant Association has refused to allow Plaintiffs Lippert to construct fencing (to include the privacy fence requested and the screening temporarily in place as to the "King Ranch" style fence that was approved), and to plant Crepe Myrtle trees, has refused to allow the Campbells to construct an RV screen, and refuses to allow Plaintiff McKinnon a storage shed similar in location to other storage sheds on other properties located within the Comal Trace subdivision, all in violation of the Plaintiffs' property rights and the relevant Declaration (*i.e.*, Declaration Units 1, 2 and 4).

<div align="center">139.</div>

Further, Plaintiffs Doug and Jane Lippert aver that the Declaration for the Comal Trace subdivision does not deny them the right to construct and maintain fencing (to include the

privacy fence requested and the "windscreen" currently in place), or to plant Crepe Myrtle trees in the front of their property as it currently exists.

140.

Likewise, although as previously parked the RV was in compliance as it was substantially out of public view, Plaintiffs Joe and Anita Campbell aver that the Declaration for the Comal Trace subdivision do not deny Plaintiffs Campbell the right to construct and maintain a screen on their property to shield an RV from any possible public view.

141.

Additionally, Plaintiff McKinnon avers that there are such an extensive number of structures located within front, side and back setbacks on lots within the Comal Trace subdivision in violation of the Association's restrictive covenants that the specific restriction against placing structures in the prohibited setback areas has been waived or abandoned at the time this lawsuit was filed.

142.

Plaintiffs are only attempting to have Defendant Association comply with its obligations under the Declaration and the common law of the State of Texas.  The decision made by the Defendant Association, and its actions related thereto, are in direct contravention of the public policy of the State of Texas, which is in support of seeking the greatest use of property. Defendant Association is denying Plaintiffs the opportunity to make the greatest use of their property under this public policy.

143.

Despite Plaintiffs' rights, the Defendant Association continues to deny Plaintiffs Lippert the right to construct and maintain fencing (to include the privacy fence requested and the

"windscreen" currently in place), to plant Crepe Myrtle trees, and (at least initially) to install a pool on their property, continues to deny the Campbells the right to construct and maintain a screen on their property to shield their RV from any possible public view and continues to deny Plaintiff McKinnon the right to construct a mini-garage on his property. The Lipperts also seek permanent injunctive relief that they not be excluded from use of the common areas or the Park again without a hearing unless authorized by law. As a result of the foregoing, the Plaintiffs will suffer irreparable injury unless the Association is restrained and enjoined from its actions.

<div align="center">144.</div>

The Plaintiffs will show that there is no remedy at law that is clear and adequate to protect the Plaintiffs' interests against these wrongful actions by the Defendant Association. The Plaintiffs request injunctive relief so that justice may be done, not merely for delay. The Plaintiffs have performed all conditions precedent which they have been able to perform, which were not prevented by the Defendant Association's own acts, and have the ability to be ready, willing, and able to perform each and every obligation imposed by the Declaration, and to perform any equitable acts as the court deems necessary.

<div align="center">**ADDITIONAL CAUSES OF ACTION**</div>

Causes of action are alleged above. This section adds to those allegations.

<div align="center">DECLARATORY RELIEF AND INJUNCTIVE RELIEF</div>

<div align="center">145.</div>

Plaintiffs seek relief under Chapter 37 of the Texas Civil Practices and Remedies Code (Declaratory Judgment Act) as set forth above. This Court has the power under 37.003 of said Act to declare the rights, status, and other legal relations between the parties that will terminate the controversy and remove the uncertainty. Chapters 34.004 and 37.005 (3) of said Act further

provides for the power of this Court to declare rights as to a written contract or trust document or other writing, such as obligations under the subject Restrictions or Declarations, before or after the alleged breach. Per Chapter 37.006 of such Act, all persons who have a claim or interest in the declaration such as Defendant can or even must be made parties. Although denoted as an amended pleading, this pleading incorporates the prior sworn statements seeking injunctive relief in its prior petition; as such, this pleading may be considered a supplement but the omission of claims herein that may have been in the Fourth Amended Petition (*i.e.,* DTPA and statutory unreasonable collection practices) is intended to be omitted or nonsuited to narrow the issues before trial.

<div align="center">146.</div>

Specifically, Plaintiffs seek a declaratory relief against Defendant regarding the rights and status of the relationship as set forth above in this cause, which is incorporated herein.

<div align="center">*Negligence; Tortious Interference with Property Rights;*
*Disparagement; Intentional Infliction of Mental Distress*</div>

<div align="center">147.</div>

Plaintiffs would show that Defendant Association had a duty to fairly and objectively consider Plaintiffs' requests to construct and maintain their requests to use their own property in a manner requested. Accordingly, as a result of the conduct described above, Defendant Association has been negligent and/or has tortiously interfered with Plaintiffs' property rights. Furthermore, Chapter 209 of the Texas Property Code, and especially Section 209.0051 Open Board Meetings, thereof, indicates that a Board of Directors is to go into executive session when there are matters to be discussed that affect or involve personal and private information of the members of the Association. Section 209.0051 is quite explicit that the Association, through its

Board of Directors, is not to breach the privacy or divulge members' private information out loud in the regular Board meeting.

148.

However, as explained hereinabove, on the premise that a provision of the Bylaws applied, Chris Eldridge, asked Plaintiffs Lippert to exit the building where the Board meeting was being held in January and informed them they were prohibited from attending because of their litigation with the Association.   Chris Eldridge then went back inside and publicly announced the exclusion to all in attendance, because they were involved in litigation with the Association.

149.

Plaintiffs Lippert contend that the Association, through the Board of Directors as a whole, acted inappropriately in allowing such conduct by the Board President, and that the Board President, Chris Eldridge, acted outside his allowable role as a Director of the Association, acted ultra vires, and intentionally sought to publicly humiliate Plaintiffs Lippert through divulging private information about them to other owners in the community at an Association event. Plaintiffs have suffered injury.   Further, the Lipperts contend that Chris Eldridge acted intentionally causing Plaintiffs to experience emotional distress, mental anguish, humiliation, and loss of reputation.  Chris Eldridge's conduct was also designed to intentionally inflict mental distress on the Lipperts.

150.

Furthermore, Defendant Association has intruded into the seclusion of Mrs. Campbell by entering Plaintiffs Campbell's property without notice or courtesy to attempt to view the RV owned by Plaintiffs Campbell.  The Defendant Association took such action even after Mr.

Campbell informed the Association that he would not be at home, but rather was working out of the country, and that Mrs. Campbell was under medical guidance to avoid any stress, while she undergoes cancer therapy, and resides at their home.   Despite such foreknowledge, in early January 2015 Defendant Association enters the property and harasses Mrs. Campbell, demanding to know details about the RV and her husband's whereabouts.   Plaintiffs Campbell contend that this also qualifies as intrusion into seclusion, and that Mrs. Campbell has been injured by the Defendant Association's conduct, as is set forth more fully herein below.

## CIVIL CONSPIRACY

### 151.

Although Mickey, Seabolt, and Sommer are not being sued herein as individuals, Plaintiffs Doug and Jane Lippert also allege that Defendant acted in civil conspiracy with Bernadina Mickey, James Seabolt, and Richard Sommer to deprive Plaintiffs of their property rights, and to disparage and tortuously interfere with plaintiffs' property rights, and right against disparagement for which Plaintiffs sue Defendant Association for all damages.   Plaintiffs McKinnon and Anita Campbell have also suffered mental distress and substantial and severe mental anguish.

## CONDITIONS PRECEDENT

### 152.

All conditions precedent to recovery by Plaintiffs have been performed or have occurred or been excused.

### REQUEST FOR ATTORNEYS' FEES AND COSTS

#### 153.

Based on the foregoing described acts and omissions of the Defendant, Plaintiffs have been required to hire legal counsel to protect their property rights and legal rights, and to incur substantial legal fees related to the prosecution of this action. Accordingly, request is made for all costs and reasonable and necessary attorneys' fees incurred by or on behalf of the Plaintiffs herein, including all fees necessary in the event of an appeal of this Cause to the Court of Appeals and the Supreme Court of Texas, as the Court deems equitable and just, as provided by: Tex. Civ. Prac. & Rem. Code 37.001, et. seq., the Restrictions, and the Texas Property Code. See also the claims for fees per above.

#### 154.

In the event of an unsuccessful appeal by Defendant to the Court of Appeals, Plaintiffs would incur additional, reasonable, equitable, and just attorneys' fees. In the event of an appeal to the Texas Supreme Court, Plaintiffs would incur additional reasonable, equitable, and just attorneys' fees.

### DAMAGES

#### 155.

Plaintiffs have been damaged by the Defendant's acts and omissions, and do seek actual damages, alternatively nominal damages, and punitive damages, as explained herein above. Plaintiffs' actual damages include past pain and suffering and past mental anguish for the conduct of the Defendant.

156.

Some of Defendant Association's board members have furtively and openly demonstrated their attitudes of personal animus toward Plaintiffs, by participating in or condoning an environment of sending or posting anonymous communications to members of the Association putting Plaintiffs in a bad or false light, or disparaging Plaintiffs personally. Bernadina Mickey in particular worked with the Chair of the Deer Conservation Committee James Seabolt and ACC Chair Richard Sommer to put Plaintiffs in a false light in communications to membership. ACC members said or tolerated other members calling Mr. Lippert a "dumb SOB" and "a-hole" when such members were being presented submissions for reconsideration of the denial of the Lipperts' privacy fence. Ms. Mickey from the Board also directed or vented comments designed to vilify Plaintiffs, flipping off the Lipperts and calling Plaintiffs or their supporters a "rogue" group or crew and attempting to drum up counterclaims against the Campbells.

157.

Bernadina Mickey, as a representative of the Association, made light of Plaintiff McKinnon's medical condition incurred while in the armed services and exacerbated in this matter. Within two weeks of Mickey's reported resignation from the Board, she launched into a public tirade against Plaintiffs, revealing further her attitudes while on the Board for almost two years prior. Mrs. Mickey has continued to be treated as a representative of the Association after August 2015 for the purposes of this lawsuit. Specifically, Bernadina Mickey verbally abused Mr. McKinnon and Mr. Lippert at the entrance of the subdivision where the community mailboxes are located, including disparaging Plaintiffs in front of one or more other homeowners. Ms. Mickey, as if to say she could actually say what she was thinking all along at

Board meetings, in a public tirade at the community mailboxes, stated she was no longer on the Board when, without provocation, she looked at Mr. Lippert and advised him to "kiss my ass!". Ms. Mickey in mid-September 2015 yelled to anyone who would listen at the community mailboxes that Plaintiffs were harming the community.

<div align="center">158.</div>

Board member Bernadina Mickey, on at least one occasion, told others on the Board without contradiction that Mr. McKinnon was "not owed crap" by the Association. Defendant Association fostered this attitude of personal animus against Plaintiffs. The Association through its representatives acted with malice towards Plaintiffs. Following Ms. Mickey's advice, Mr. McKinnon and others were denied basic information as homeowners, such as financial information or other responses owed to them as mandatory members of the Association. Mr. McKinnon, as an ACC member, was marginalized by the Association, depriving him of information regarding alleged violations in the subdivision he had routinely obtained as an ACC member.

<div align="center">159.</div>

Further, on information and belief, Plaintiffs allege one or more representatives of the Board of Directors of Defendant Association knew or promoted a posting of a flyer on the community bulletin board urging members to attend a board meeting on April 28, 2015. Such flyers also sought to shame or vilify Plaintiffs or instill fear of Plaintiffs prevailing in the lawsuit. One Plaintiff wrote on the flyer "who are you?" Plaintiff Lipperts assert a board member of the Defendant thereafter wrote or caused to be placed on the same flyer "we are the neighbors that AREN'T white trash."

160.

Furthermore, Plaintiffs Campbell additionally seek reimbursement costs associated with for the period of time that their RV had to be stored off of their property, while Plaintiffs Lippert requests reimbursement for the cost of the temporary screen installed to promote the growth of the installed landscaping since the privacy fence was disallowed.

**PUNITIVE DAMAGES**

161.

As indicated above, Defendant Association through its agents, including Chris Eldridge, Bernadina Mickey, James Seabolt, Richard Sommer and others, has acted in such a manner as to demonstrate their conscious indifference to Plaintiffs' rights, gross negligence, or in the case of the Lipperts, intentional misconduct (intentional infliction of mental distress and vindictive interference with their property rights). The Association knew 3 months in advance from its professional management company the pitfalls of excluding a member from facilities used by the Association at a board meeting, and proceeded to humiliate the Lipperts anyway. Defendant has sought to shame and humiliate individual Plaintiffs. Some Plaintiffs have been excluded from common areas of the Subdivision. Defendant through its agents has disparaged or defamed Plaintiffs. Plaintiffs have been cussed at, called names, flipped off, and made the subject of furtive communications by the Defendant to shame, humiliate and/or vilify Plaintiffs. See above.

162.

Such conduct allows for the jury's consideration of punitive damages. Plaintiffs, therefore, request that the jury consider Defendant's conduct and award such sums against Defendant Association that would dissuade the Defendant, and others who might seek to similarly interfere with the lawful property and legal rights of others, from acting in such manner

in the future. Plaintiffs urge that the jury consider whatever sum the jury feels is appropriate, whether that be $1 or $100,000 for each Plaintiff as against Defendant, or higher as the jury determines is appropriate.

## PERMANENT INJUNCTION

### 163.

Plaintiffs request that the Court issue a Permanent Injunction that restrains Defendant and/or its agents, servants, representatives and/or employees, from directly or indirectly attempting to interfere with Plaintiffs' property rights associated with Plaintiffs' respective properties as set forth above, and from prohibiting Plaintiffs' attendance at any Association meetings or Board of Directors meetings in contravention of applicable Texas law (i.e., Texas Property Code Sections 209.0051 and 209.0055).

## GENERAL DENIAL

### 164.

Subject to such stipulations, admissions or additional pleadings as may hereinafter be made or filed, Counter-Defendants Jane and Doug Lippert generally deny each and every allegation contained in the Association's Counterclaim against them, and respectfully requests that Defendant be required to prove its claims against the Plaintiffs by a preponderance of the evidence as required as required by law. The Lipperts also alternatively assert waiver, acquiesce, consent, approval, estoppel, and lack of clean hands as defenses to the Association's counterclaim.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs BRYAN D. "DOUG" LIPPERT et ux. JANE LIPPERT, JOSEPH W. CAMPBELL et ux. ANITA H. CAMPBELL and RONALD

NORMAN McKINNON, and CTHOAG respectfully pray that the prior verifications herein continue in this cause as supplemented herein (therefore, although this pleading is called an amended pleading, it supplements the Fourth Amended Petition as it relates to the verified claims for injunctive relief so that verifications need not be circulated again for execution), that upon a final hearing of the cause, Defendant be denied all claims pled against Plaintiffs Lipperts and ordered to take nothing, that Plaintiffs have judgment of this Court declaring that Plaintiffs are entitled to the relief sought by virtue of their claims which appear herein above and entitled to the relief sought herein above, for injunctive relief, and that judgment be entered for the Plaintiffs against Defendant, jointly and severally, for the actual damages requested herein above in an amount in excess of the minimum jurisdictional limits of the Court, together with prejudgment and post-judgment interest at the maximum rate allowed by law, attorneys' fees, costs of court, punitive damages, and such other and further relief to which the Plaintiffs may be entitled at law or in equity, whether pled or unpled.

<div style="margin-left:40%">

Respectfully submitted,

**LANGLEY & BANACK, INC.**
Trinity Plaza II, Ninth Floor
745 East Mulberry
San Antonio, Texas 78212-3166
(210) 736-6600 – Telephone
(210) 735-6889 – Telecopier

*/s/ Peter L. Kilpatrick*
PETER L. KILPATRICK
STATE BAR NO. 11416545
pkilpatrick@langleybanack.com

ATTORNEYS FOR PLAINTIFFS BRYAN D. "DOUG"
LIPPERT, JANE LIPPERT, JOSEPH CAMPBELL,
ANITA CAMPBELL, RONALD McKINNON, AND
COMAL TRACE HOME OWNERS ADVOCACY
GROUP

</div>

CERTIFICATE OF SERVICE

I hereby certify that on 8th day of March 2016, a true and correct copy of the foregoing instrument was served on counsel of record as provided for in T.R.C.P. 21.

GRANT E. "TRES" ADAMI, III
ADAMI, SHUFFIELD, SCHEIHING & BURNS, P.C.
SWBC Tower
9311 San Pedro Avenue, Suite 900
San Antonio, Texas 78216
Fax: 210-344-7228
tadami@adamilaw.com

TOM L. NEWTON, JR.

ALLEN STEIN &DURBIN, P.C.
6243 IH-10 West, Suite 700
San Antonio, Texas 78201
Fax: 210-738-8036
tnewton@asdh.com

*Attorneys for Defendant Comal Trace*
*Homeowners Association*

/s/ Peter L. Kilpatrick
PETER L. KILPATRICK

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, | § § § | |
| Plaintiff, | § § § | |
| COMAL TRACE HOMEOWNERS ASSOCIATION, CHRIS ELDRIDGE, BRYAN D. "DOUG" LIPPERT, JANE LIPPERT, JOSEPH CAMPBELL, ANITA CAMPBELL, RONALD McKINNON, and COMAL TRACE HOMEOWNERS ADVOCACY GROUP, | § § § § § § § § § | CIVIL ACTION NO. 1:16-cv-1019-SS |
| Defendants. | § | |

**DECLARATION OF TOM L. NEWTON, JR.**

STATE OF TEXAS          §
                                     §
COUNTY OF BEXAR    §

"My name is Tom L. Newton, Jr. I am one of the attorneys for Defendant, Comal Trace Homeowners Association, that represented the Association in *Bryan D. "Doug" Lippert, et al. v. Comal Trace Homeowners Association*, Cause No. C2014-1453C, 274th Judicial District Court of Comal County, Texas) (the "Underlying Lawsuit"). I am over the age of eighteen years. I am fully competent in all respects to testify. I have personal knowledge of the matters contained in paragraphs 1, 2, and 4 of the Motion to Dismiss for Lack of Subject Matter Jurisdiction, based on my personal involvement in the Underlying Lawsuit, and they are all true and correct.

"I declare under penalty of perjury that the foregoing is true and correct."

Signed on November 8, 2016.

_____
TOM L. NEWTON, JR.

5537 007/1460652

EXHIBIT
C